# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| INTERNATIONAL ALLIANCE OF THEATER STAGE EMPLOYEES LOCAL 927,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW MASHBURN, EDWARD LINDSEY, JANICE W. JOHNSTON, and SARA TINDALL GHAZAL, *in their official capacities as members of the Georgia State Election Board*; and PATRISE PERKINS-HOOKER, AARON V. JOHNSON, MICHAEL HEEKIN, and TERESA K. CRAWFORD, *in their official capacities as members of the Fulton County Registration and Elections Board*,<br><br>Defendants. | No. 1:23-cv-04929-AT |

## PROPOSED INTERVENORS' PROPOSED MOTION TO DISMISS

Thomas R. McCarthy*
Gilbert C. Dickey*
Conor D. Woodfin*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423

Alex B. Kaufman
CHALMERS, ADAMS, BACKER & KAUFMAN, LLC
11770 Haynes Bridge Road #205-219
Alpharetta, GA 30009-1968
(404) 964-5587
akaufman@chalmersadams.com

*pro hac vice* forthcoming

*Counsel for Proposed Intervenors*

## INTRODUCTION

The Plaintiffs demand that this Court invalidate reasonable state election rules before the next election. Georgia's deadline for voters to apply to vote by absentee ballot reflects the reasoned judgment of the state legislature. The Plaintiffs claim it violates federal law, but they're wrong for two reasons.

First, Congress has no power to displace state deadlines for absentee-ballot applications. In the 1970 amendments to the Voting Rights Act, Congress included a provision that requires States to permit qualified voters "who may be absent from their election district or unit" to vote by absentee ballot in presidential election so long as they apply within "seven days" before the election. 52 U.S.C. §10502(d). But Congress has no power to enact such a requirement. In *Oregon v. Mitchell*, the Supreme Court upheld other portions of that statute in a fractured decision, but it did not reach the seven-day deadline at issue here. 400 U.S. 112 (1970). And under current precedent, the seven-day deadline does not pass constitutional muster. Neither the Fourteenth Amendment nor the Electors Clause nor any other constitutional provision gives Congress authority to enact the national seven-day application deadline. The federal law is unconstitutional, and thus the Plaintiffs' claim fails.

Second, even if the federal seven-day deadline were constitutional, the Plaintiffs' facial challenge fails. The federal seven-day deadline applies only to voters "who may be absent from their election district or unit." 52 U.S.C. §10502(d). But that does not mean there are no circumstances in which Georgia may lawfully apply its eleven-day deadline. Indeed, the federal law the Plaintiffs invoke doesn't apply *at all* to Georgia's regulation of absentee

balloting for voters who are present in "their election district or unit" on election day. *Id.*; *see* Ga. Code §§21-2-380, -381(a)(1)(A), -385(c)-(d).

The Court should dismiss the Plaintiffs' complaint.

## BACKGROUND

For most of this Nation's history, every State required voters to be a resident of the State for a period of time before they could vote in elections. *See Elections – Qualification of Voters – Residency Requirements Reduced for Voting in Presidential Elections – Uniform Act for Voting by New Residents in Presidential Elections*, 77 Harv. L. Rev. 574, 574 (1964). The durations ranged from six months to two years and allowed new residents to become familiar with local concerns and candidates before voting in the State's elections. *Id.* But States gradually recognized that presidential elections were unique. Unlike congressional or state candidates, presidential candidates are on the ballots in multiple States. They campaign on national platforms, address national issues, and are chosen by electors across the country, not just in one State. Thus, a voter who moved from California to Idaho during the election season would likely be considering the same issues and candidates for the presidency, regardless of the move.

Acknowledging the national character of presidential elections, several States adopted the Uniform Voting by New Residents in Presidential Election Act. *See Elections*, *supra*, at 574 n.4. The aim of the act was to reduce the length of time required to be a resident of a State to vote in presidential elections. *Id.* at 574-75. Idaho was one of the early adopters, amending its constitution to permit new residents to vote in presidential elections so long as they had re-

sided in the State for at least 60 days and were otherwise qualified to vote. *See* Idaho S.J.R. 6 (Nov. 6, 1962), *amending* Idaho Const., art. 6, §2. To vote in all other elections, voters had to reside in the State at least six months prior to the election. *See* An Act Defining General Election, ch. 140, §37, 1970 Idaho Laws 351, 370. And if a voter moved counties within the State, there was a 30-day residency requirement. *Id.*

Congress was dissatisfied with the States' slow progress toward uniformity on residency requirements. In 1970, Congress amended the Voting Rights Act to address durational residency requirements and other civil rights concerns. *See* Pub. L. No. 91-285, 84 Stat. 314 (1970). The amendments added three new provisions: (1) a minimum voting age of eighteen years to vote in state and federal elections; (2) a prohibition on States from requiring voters to meet a minimum residency duration to vote in presidential elections; and (3) uniform rules for absentee voting for presidential elections.

President Nixon had misgivings about the constitutionality of the national voting age. In his signing statement, the President wrote that although he "strongly favor[ed] the 18-year-old vote," he "believe[d]—along with most of the Nation's leading constitutional scholars—that Congress has no power to enact it by simple statute, but rather it requires a constitutional amendment." President Richard Nixon, *Statement on Signing the Voting Rights Act Amendments of 1970* (June 22, 1970). Nevertheless, Nixon signed the bill and directed the Attorney General to file "a swift court test of the constitutionality of the 18-year-old provision." *Id.*

Just a couple months later, the Supreme Court received several original actions that raised the constitutionality of some of the new provisions. *See Oregon v. Mitchell*, 400 U.S. 112, 117 n.1 (1970) (op. of Black, J.). The United States filed two cases attempting to enforce the new provisions against Idaho and Arizona. Oregon and Texas filed the other two cases against the U.S. Attorney General, arguing that some of the new provisions were unconstitutional. All four cases raised the constitutionality of the national voting age. *See id.* The case against Arizona raised the constitutionality of the nationwide literacy-test ban, and the case against Idaho raised the constitutionality of the ban on durational-residency requirements and the uniform absentee-voting rules. *Id.* All four cases were consolidated in *Oregon v. Mitchell.*

The case fractured the Court. All Justices agreed that Congress could prohibit literacy tests under the Fourteenth and Fifteenth Amendments. *Id.* at 118. A majority of the Court agreed that the 18-year-old minimum voting age was constitutional only as applied to federal elections, but they failed to form a majority on the reasoning. *Id.* at 117-18. Similarly, the Court agreed that Congress could set residency requirements and provide for absentee balloting in presidential elections. *Id.* at 118. Justice Harlan dissented from that conclusion. *Id.* at 118-19. He would have held that the residency and absentee rules of the 1970 amendments were unconstitutional. *Id.*

The remaining Justices split on their reasoning. Justice Black alone would have found that the Electors Clause gave Congress authority to preempt residency requirements. *Id.* at 124 (op. of Black, J.); *see also id.* at 134. The other seven Justices relied on Congress's remedial power under §5 of the

Fourteenth Amendment to enforce the Privileges or Immunities Clause. Justice Douglas, writing for himself, believed that the ban on durational residency requirements was a valid exercise of Congress's remedial power to protect the right to vote. *See id.* at 150 (op. of Douglas, J.). Justice Brennan, joined by two others, reasoned that Congress could prohibit residency requirements under the Fourteenth Amendment to protect the right to interstate travel. *Id.* at 237-38 (Brennan, J., concurring). Justice Stewart, joined by two others, reached the same conclusion. *Id.* at 285-86 (Stewart, J., concurring). Even though the Justices applied their reasoning only to the durational residency requirements, some of them described their decision as broadly upholding "Section 202 [of] the Voting Rights Act Amendments of 1970," which contains the uniform absentee voting rules. *Id.* at 285 (Stewart, J., concurring); *see also id.* at 237 (Brennan, J., concurring).

This case concerns a narrow portion of those absentee voting rules. Section 202 of the 1970 amendments, now codified at 52 U.S.C. §10502, contains both the durational-residency provision and the rules concerning absentee voting. Among other things, those absentee rules require States to "provide by law for the casting of absentee ballots" for presidential elections "by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held." 52 U.S.C. §10502(d). Ballots of such voters must be counted so long as the voter applies "not later than seven days immediately prior to such election and have returned such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election." *Id.*

6

The decision upholding parts of the Voting Right Act in *Oregon v. Mitchell* does not reach this provision. Only the complaint against Idaho invoked Section 202's absentee-ballot rules. *See* Complaint at 5, *United States v. Idaho*, 400 U.S. 112 (Aug. 1970) (No. 47, Original) (challenging Idaho's "continued enforcement of the durational residency requirements and absentee voting provisions (to the extent inconsistent with Section 202…).").[1] But Idaho did not have any laws inconsistent with the seven-day absentee-application deadline. At the time, any Idaho voter who would be absent from her precinct on election day could apply to vote absentee by filing a written application before the election. *See Mitchell*, 400 U.S. at 239 n.19 (Brennan, J., concurring). Idaho allowed the "application to be made at any time." *Id.* Since Idaho didn't have an absentee-application deadline, the United States only challenged its durational-residency requirement, absentee-ballot deadline, and minimum voting age. *See* Complaint at 4-6, *United States v. Idaho*, 400 U.S. 112 (Aug. 1970) (No. 47, Original).[2] And *Oregon v. Mitchell* never addressed Section 202's seven-day application rule.

Against this backdrop, Georgia changed the window for submitting absentee-ballot applications. To vote by mail-in ballot in Georgia, voters must apply at least eleven days before the election. Ga. Code §21-2-381(a)(1)(A). The Georgia Legislature adopted this deadline after weighing a variety of adminis-

---

[1] A copy of the complaint is attached in the Appendix to this Motion.

[2] In 1970, Idaho passed a law that would impose a deadline to file absentee-voting applications of "5:00 p.m. on the day before the election," effective January 1, 1971. An Act Defining General Election, ch. 140, §163, 1970 Idaho Laws 351, 407; *see also Mitchell*, 400 U.S. at 239 n.19 (Brennan, J., concurring). But even that rule would not have conflicted with Section 202's seven-day deadline.

trative and electoral considerations. *See* State Defendants' Br. in Support of Mot. to Dismiss at 2, Doc. 46-1. The deadline is a reasonable exercise of the Legislature's authority to govern elections, and it conflicts with no valid federal law.

## ARGUMENT

### I.   Congress does not have power to regulate the absentee-ballot application deadline for presidential elections.

The State Legislatures bear primary responsibility for regulating the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art I, §4. Congress can, if it so chooses, "make or alter such Regulations, except as to the Places of chusing Senators." *Id.* But for presidential elections, Congress can only "determine the Time of chusing the Electors, and the Day on which they shall give their votes." U.S. Const. art II, §1.

Nevertheless, Congress claimed authority to regulate the "manner" of presidential elections in the 1970 amendments to the Voting Rights Act. In Section 202 of the amendments, Congress abolished durational residency requirements for presidential elections and established uniform absentee voting and registration requirements. *Oregon v. Mitchell* upheld some of those provisions, but not the seven-day absentee ballot application deadline at issue here. And since that case, the Court's understanding of the limits of Congress's remedial power under the Fourteenth Amendment and the right to travel have evolved, undermining the rationale for its Section 202 holdings. Even if that were not the case, the *Mitchell* plurality's reasoning to broadly uphold other aspects of Section 202 based on the right to travel cannot support a national

absentee-application deadline. And no other constitutional provision supports it, either.

**A.    Congress cannot preempt States' absentee-application deadlines to protect the right to interstate travel.**

Section 202's seven-day deadline for absentee-ballot applications fails the test for remedial legislation protecting a right to interstate travel under the Fourteenth Amendment. "Congress' power under §5 … is limited to adopting measures to enforce the guarantees of the Amendment." *Saenz v. Roe*, 526 U.S. 489, 508 (1999) (cleaned up). But "[l]egislation which alters the meaning" of a right "cannot be said to be enforcing" that right. *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). For legislation enacted under §5, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. That is, "[t]he appropriateness of remedial measures must be considered in light of the evil presented." *Id.* at 530. Moreover, "a statute's 'current burdens' must be justified by 'current needs.'" *Shelby Cnty. v. Holder*, 570 U.S. 529, 550 (2013) (citation omitted). Legislation "based on decades-old data and eradicated practices" is suspect, even if that data would have supported the legislation at the time of enactment. *Id.*

For the right to interstate travel, a remedial law must be congruent and proportional to the discriminatory treatment of new residents. In *Dunn v. Blumstein*, the Supreme Court explained why durational residency requirements, even for non-presidential elections, unconstitutionally burden the right to interstate travel. 405 U.S. 330 (1972). "Durational residence laws impermissibly condition and penalize the right to travel by imposing their prohibitions

on only those persons who have recently exercised that right." *Id.* at 342. But that right is not "directly impinge[d]" unless a law "penalize[es] those persons, and only those persons, who have gone from one jurisdiction to another." *Id.* at 338. It does not reach incidental burdens resulting from laws that apply to "all residents, old and new." *Id.* at 342 n.12 (citing *Shapiro v. Thompson*, 394 U.S. 618, 638 n. 21 (1969)).

Section 202's seven-day deadline for absentee-ballot applications does not directly enforce the right to travel because it bars deadlines that reach "all residents, old and new." *Id.* Of course, all deadlines—whether to obtain a driver's license, register to vote, respond to a jury summons, or receive an absentee ballot—might interfere with someone's travel plans. Indeed, even Section 202's seven-day deadline would have that effect. But such incidental effects do not implicate the right to interstate travel. *See id.* Thus, forcing States to adopt more lenient deadlines doesn't "enforce" the guarantee of interstate travel—it just provides interstate travelers with an extra-constitutional benefit. U.S. Const. amend. XIV, §5. But remedial legislation must "enforce," not "alter" the rights guaranteed in the Fourteenth Amendment. *City of Boerne*, 521 U.S. at 519.

Nor can the seven-day absentee-application deadline survive under the "congruent" and "proportional" test for §5 legislation. The only conceivable explanation for the absentee provisions is that they facilitate interstate travel by providing more generous absentee-voting rules for out-of-state residents. *See* 116 Cong. Rec. S6991 (Mar. 11, 1970) (statement of Sen. Goldwater) (discussing the "millions of Americans" who are not able to vote "because they are ex-

10

ercising their constitutional right to travel in interstate commerce"). But Section 202's seven-day application deadline is poorly tailored to achieving that goal. For one, the application deadline is overinclusive: it applies not only to out-of-state voters, but also to voters who are merely "absent from their election district or unit." 52 U.S.C. §10502(d). Moving from county to county within the State has nothing to do with *inter*state travel, the "privilege of immunity" protected by the Fourteenth Amendment. For another, the provision is underinclusive: it applies only to presidential elections. Congress tacitly endorsed stricter absentee-voting requirements for congressional and state office, even though those rules equally burden voters traveling out of state. The seven-day deadline "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532.

Moreover, the "current burdens" of a seven-day deadline are also not justified by its "current needs." *Shelby Cnty.*, 570 U.S. at 550. Indeed, Congress didn't even bother to justify the burdens at the time of enactment. Senator Goldwater, who introduced the provisions of Section 202, could neither explain the need for nor justify the burdens of the seven-day deadline. He admitted that, at the time, "37 States allow certain voters to make application for absentee ballots up to a week before the election." 116 Cong. Rec. S6991 (Mar. 11, 1970) (statement of Sen. Goldwater). There was no need for a change at all. And the seven-day deadline Congress adopted was arbitrary—no one explained why seven days would protect the right to travel better than, for example, Idaho's more generous election-day deadline, or an eleven-day deadline such

as Georgia's. Instead, the seven-day deadline was "drawn from the proven practice of the States themselves," showing that the legislation neither *identified* nor *solved* any problem. *Id.*

"A comparison" between the seven-day application deadline and the 1970 amendments targeting racial discrimination "is instructive." *City of Boerne*, 521 U.S. at 530. In those amendments, Congress banned literacy tests, renewed the law's preclearance regime, and enacted other provisions meant to address racial discrimination in voting. Congress supported these provisions with months of hearings, volumes of legislative findings, and detailed reports on precise forms of racial discrimination in voting. In comparison, the seven-day deadline has barely a few lines of explanation in the congressional record. Even the Religious Freedom Restoration Act had far more support in the legislative record than the seven-day application deadline, but the Court concluded it was insufficient to pass muster under §5. *See id.* at 530-31. Congress made no effort to explain how application deadlines were infringing the right to interstate travel. This "lack of support in the legislative record," is a "serious shortcoming" that dooms the seven-day deadline. *Id.* at 531.

As discussed above, *Oregon v. Mitchell* did not hold otherwise. That case did not address whether the federal seven-day deadline for absentee-ballot applications is constitutional. The parties never even litigated the issue. The United States never challenged Idaho's deadline for absentee-voting applications, because there was no conflict under Idaho law with the seven-day deadline in Section 202. *See* Complaint, *United States v. Idaho*, 400 U.S. 112 (Aug. 1970) (No. 47, Original); *Mitchell*, 400 U.S. at 239 n.19 (Brennan, J., concur-

ring). The constitutionality of the seven-day deadline was thus "an issue that was not squarely before [the court], was not challenged by the parties, and was not necessary for decision in the case." *State v. Sims*, 236 P.3d 642, 648-49 (N.M. 2010).

Further, *Mitchell* cannot be extended to reach the seven-day deadline through broad *dicta* in plurality opinions. To start, the judgment of the Court, announced by Justice Black, doesn't even mention the deadline. *Mitchell*, 400 U.S. at 118 (op. of Black, J.) ("Congress can set residency requirements and provide for absentee balloting in elections for presidential and vice-presidential electors."). Even if it did, the scope of a judgment "is not to be determined by isolated passages in the opinion considering the rights of the parties, but upon an examination of the issues made and intended to be submitted, and which it was intended to decide." *Oklahoma v. Texas*, 272 U.S. 21, 42-43 (1926). "Every decree in a suit in equity must be considered in connection with the pleadings, and, if its language is broader than is required, it will be limited by construction so that its effect shall be such, and such only, as is needed for the purposes of the case that has been made and the issues that have been decided." *City of Vicksburg v. Henson*, 231 U.S. 259, 269 (1913) (citation omitted). Said differently, "the judgment … closes and puts an end to no questions but those upon which it does depend, and of which a determination was essential to the conclusion expressed by the judgment." *United States ex rel. Moser v. Meyer*, No. 2307, 1912 WL 19468, at *3 (D.C. Cir. Jan. 2, 1912). These principles are "well settled." *City of Vicksburg*, 231 U.S. at 269.

These well-settled principles confirm that the plurality's broad language cannot reach beyond the issues in front of the Court. *E.g.*, *Mitchell*, 400 U.S. at 237 (Brennan, J., concurring) ("[W]e believe there is an adequate constitutional basis for [Section] 202 in §5 of the Fourteenth Amendment."); *id.* at 292 (Stewart, J., concurring) ("I conclude that it was within the power of Congress to enact [Section] 202."). "[B]road language" that is "read alone, without regard to the pleadings in the case," does not indicate the true judgment of the Court. *City of Vicksburg*, 231 U.S. at 268-69. When read alongside the pleadings, the judgment and opinion of the Court reveal that they did not reach the seven-day deadline in Section 202.

Neither can this Court extend the plurality's reasoning in *Oregon v. Mitchell* to the seven-day deadline. A plurality in *Mitchell* upheld Section 202 on the rationale that Congress enacted those provisions under its Fourteenth Amendment power to protect the right to interstate travel. But for at least two reasons, that rationale doesn't hold up for the seven-day deadline.

*First*, extending *Mitchell* to the seven-day deadline would conflict with the Supreme Court's test for remedial legislation under the Fourteenth Amendment. Since *Mitchell*, the Court has clarified that "Congress' power under §5 … is limited to adopting measures to enforce the guarantees of the Amendment," *Saenz*, 526 U.S. at 508 (cleaned up), and the means must be "congruen[t] and proportional[]" to the ends, *City of Boerne*, 521 U.S. at 520.

The *Mitchell* plurality did not apply these standards when it upheld the limited portions of Section 202. Justice Brennan employed a form of strict scrutiny, placing the burden on Idaho to show "that no less intrusive means will

adequately protect compelling state interests" in the State's durational residency requirement. *Mitchell*, 400 U.S. at 238 (Brennan, J., concurring). Justice Stewart placed a rational-basis burden on Congress, concluding that "Congress could rationally conclude that the imposition of durational residency requirements unreasonably burdens and sanctions the privilege of taking up residence in another State." *Id.* at 286 (Stewart, J., concurring). And Justice Douglas would have deferred entirely to the judgment of Congress. *See id.* at 150 (op. of Douglas, J.) ("The relevance of the means which Congress adopts to the condition sought to be remedied, the degree of their necessity, and the extent of their efficacy are all matters for Congress."). The Supreme Court has since rejected all of these tests.

*Second*, even if this Court were inclined to extend the *Mitchell* plurality's reasoning, the right-to-travel rationale can't support a national absentee-application deadline. Neither Justice Brennan nor Justice Stewart explained how the absentee provisions in Section 202 protect the right to interstate travel. Both Justices applied their rationale only to the durational residency requirements. *Id.* at 238 (Brennan, J., concurring) ("[T]he imposition of a durational residence requirement operates to penalize those persons, and only those persons, who have exercised their constitutional right of interstate migration."); *Id.* at 286 (Stewart, J., concurring) ("Congress could rationally conclude that the imposition of durational residency requirements unreasonably burdens and sanctions the privilege of taking up residence in another State."). Neither applied their rationale to the other provisions of Section 202, and for good reason: their rationale doesn't fit. Application deadlines don't penalize

"only those persons" who are new residents, nor do they "sanction[] the privilege of taking up residence in another State." *Id.* at 238, 286. Georgia's application deadline applies uniformly to all voters, regardless of whether they are old residents, new residents, or out-of-state residents. Even under the plurality's outdated tests, Congress cannot justify a national absentee-application deadline based on the right to interstate travel.

### B. Congress cannot preempt States' absentee-application deadlines under any other constitutional power.

No other constitutional provision can support the nationalized seven-day deadline for absentee-voting applications. The Court looked for other constitutional provisions that would support Section 202 in *Mitchell*. A majority of the Court rejected each of the other options.

A majority of the Court agreed that Congress could not have enacted Section 202 under the Electors Clause. Justice Harlan properly distinguished Congress's "power to control the 'Manner'" of congressional elections from its power "with respect to the selection of presidential electors." *Mitchell*, 400 U.S. at 211-12 (Harlan, J., concurring in part and dissenting in part). Because Section 202 asserts power over the "manner" of presidential elections, it goes beyond Congress's limited powers under the Electors Clause. *Id.* at 213. Only Justice Black would have held that the Electors Clause gave Congress that authority. *See id.* at 124 (op. of Black, J.). Justice Stewart considered that the Electors Clause might not "*prevent* Congress" from passing Section 202, but he ultimately found the authority to enact Section 202 in the Fourteenth Amendment. *Id.* at 292 (Stewart, J., concurring) (emphasis added). Thus, the Electors Clause cannot support the seven-day application deadline.

The Justices likewise rejected Justice Douglas's theory that Congress could enact Section 202 to protect the right to vote. Justice Douglas reasoned that "[t]he right to vote for national officers is a privilege and immunity of national citizenship," which Congress could protect under §5 of the Fourteenth Amendment, and the Court could not question. *Id.* at 149 (op. of Douglas, J.). No other Justice agreed. Indeed, Justice Harlan explained that it was "inconceivable" that the "Privilege and Immunities Clauses" would "have been understood to abolish state durational residency requirements" at the time of their enactment. *Id.* at 214-15 (Harlan, J., concurring in part and dissenting in part).

The Court properly rejected these "frivolous" theories about Congress's power to enact Section 202. *Id.* at 213. The right-to-travel theory is the only one that obtained a slim majority of the Court, but even then, the Justices could not agree on the proper test. The Court rejected all other theories. Resting Section 202 on Congress's remedial power to protect the right to interstate travel was a last-ditch effort to save Section 202. Indeed, the United States barely preserved the argument in a single paragraph of its brief. *See* Brief for the United States at 62, *United States v. Arizona*, 400 U.S. 112 (September 1970) (Nos. 46, Original & 47, Original). And because no party raised the constitutionality of the seven-day application deadline, this Court must answer that question independently.

The authority to set rules governing the "manner" of federal elections rests with the States. Congress can "make or alter" State regulations for congressional elections, but not for presidential elections. U.S. Const. art I, §4. The

authority to set election procedures for presidential elections—including deadlines for absentee-voting applications—rests solely with the States. Congress overstepped its constitutional authority in enacting the seven-day absentee-application deadline, so the Court cannot apply it to overrule Georgia's deadline for absentee-voting applications. The Court should thus dismiss the Plaintiffs' complaint.

## II.   The Plaintiffs' facial challenge is improper.

Even if this Court finds that the federal seven-day deadline is constitutional, it cannot accept the Plaintiffs' invitation to facially enjoin the Defendants "from implementing, enforcing, or giving any effect to the absentee ballot application deadline in elections for President and Vice President." Doc. 1 at 10. That relief would exceed whatever power this Court has to enforce the seven-day deadline, which applies only to "duly qualified residents … who may be absent from their election district" on election day. 52 U.S.C. §10502(d). Nothing in federal law precludes Georgia for enforcing its earlier deadline with respect to voters who will be present in their election district on election day. The Court should thus dismiss the Plaintiffs' facial challenge.

"A facial challenge to a legislative Act is … the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). That is, "when a plaintiff attacks a law facially, the plaintiff bears the burden of proving that the law could never be constitutionally applied." *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000) (cleaned up). But in most cases, Georgia's deadline for absentee-

voting applications can be applied without controverting the seven-day deadline Congress has established.

The federal seven-day deadline applies only to voters who are "absent from their election district or unit in such State on the day such election is held." 52 U.S.C. §10502(d). But Georgia does not restrict absentee voting only to voters who will be absent from their district or county on election day—any qualified voter can vote by absentee ballot for any reason. *See* Ga. Code §§21-2-380, -381(a)(1)(A), -385(c)-(d). The federal seven-day deadline does not apply to voters who remain in their district on election day, because those voters are not "absent from their election district or unit in such State on the day such election is held." 52 U.S.C. §10502(d). Georgia can apply its eleven-day deadline to those voters without controverting the federal seven-day deadline in §10502(d). The Plaintiffs thus cannot "establish that no set of circumstances exists" under which Georgia's deadline can be applied, so their facial challenge must fail. *Salerno*, 481 U.S. at 745.

The Eleventh Circuit has said that this test might look different in federal preemption cases, but that doesn't help the Plaintiffs here. *See Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (reasoning that when applying rules of preemption, it often doesn't make sense to require the plaintiff to "prove that there is no hypothetical situation in which the [state law] could be validly applied"). For one, the Plaintiffs didn't bring a preemption claim—they brought a claim for the enforcement of federal rights under 42 U.S.C. §1983, alleging a *violation* of 52 U.S.C. §10502(d). *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1261 (11th Cir.

2012) (discussing offensive preemption claims under the Supremacy Clause). But even if the Plaintiffs had asserted federal preemption, that claim would fail because Congress chose to limit the seven-day deadline that applies to voters who will be "absent" from their counties on election day. And even if Congress hadn't explicitly drawn a limit on the reach of Section 202, applying Georgia's deadline to in-state voters doesn't conflict with Congress's purported purpose in facilitating *inter*state travel. There's no conflict between the laws that could support a facial challenge to Georgia's eleven-day deadline. *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008) ("Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law.").

Court should thus dismiss the Plaintiffs' facial challenge. And because the Plaintiffs don't include an as-applied claim, the Court should dismiss the entire complaint.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Plaintiffs' complaint.

This 12th day of January, 2024.

20

Respectfully submitted,

/s/ Alex Kaufman

GA BAR 136097

Thomas R. McCarthy*

Gilbert C. Dickey*                          Alex B. Kaufman

Conor D. Woodfin*                          CHALMERS, ADAMS, BACKER &

CONSOVOY MCCARTHY PLLC                          KAUFMAN, LLC

1600 Wilson Boulevard                       11770 Haynes Bridge Road

Suite 700                                   #205-219

Arlington, VA 22209                         Alpharetta, GA 30009-1968

(703) 243-9423                              (404) 964-5587

tom@consovoymccarthy.com                    akaufman@chalmersadams.com

gilbert@consovoymccarthy.com

conor@consovoymccarthy.com

*pro hac vice forthcoming

Counsel for Proposed Intervenors

## CERTIFICATE OF COMPLIANCE

This document complies with Local Rule 5.1(B) because it uses 13-point Century Schoolbook.

*/s/ Alex Kaufman*

## CERTIFICATE OF SERVICE

On January 12, 2024, I e-filed this document on ECF, which will email everyone requiring service.

*/s/ Alex Kaufman*