## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| INTERNATIONAL ALLIANCE OF THEATER STAGE EMPLOYEES LOCAL 927, <br><br>                Plaintiff, <br><br>   v. <br><br> JOHN FERVIER, EDWARD LINDSEY, JANICE W. JOHNSTON, SARA TINDALL GHAZAL, and RICK JEFFARES, in their official capacities as members of the Georgia State Election Board; and PATRISE PERKINS-HOOKER, AARON V. JOHNSON, MICHAEL HEEKIN, and TERESA K. CRAWFORD in their official capacities as members of the Fulton County Registration and Elections Board, <br><br>                Defendants. | Case No. 1:23-cv-04929-JPB |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.    IATSE is likely to succeed on the merits. ........................................6

    A.    Georgia's eleven-day deadline violates the Voting Rights Act. ..........7

    B.    The Voting Rights Act is constitutionally sound. ................................8

II.   An injunction is necessary to avoid irreparable harm threatened to IATSE's members........................................................................................13

III.  The balance of equities and the public interest favor preserving the right to vote. ...................................................................................................16

IV.   IATSE has associational standing to challenge Defendants' enforcement of Georgia's absentee ballot deadline..................................................17

    A.    IATSE members have standing in their own right.............................17

    B.    IATSE satisfies the remaining elements of associational standing. ...............................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Cooper*,
589 U.S. 248 (2020) ............................................................................ 12

*Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*,
833 F. App'x 235 (11th Cir. 2020) ...................................................... 20

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .......................................................... 20

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ..................................................... 17, 18

*Democratic Party of Ga., Inc. v. Crittenden*,
347 F. Supp. 3d 1324 (N.D. Ga. 2018) ............................................... 19

*Dunn v. Blumstein*,
405 U.S. 330 (1972) ............................................................................ 10

*Fair Fight Action, Inc. v. Raffensperger*,
634 F. Supp. 3d 1128 (N.D. Ga. 2022) ............................................... 18

*Fla. State Conf. of NAACP. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) .......................................................... 17

*Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*,
36 F.4th 1100 (11th Cir. 2022) ........................................................... 17

*Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*,
214 F. Supp. 3d 1344 (S.D. Ga. 2016) ............................................... 13

*In re Ga. Senate Bill 202*,
No. 1:21-mi-55555-JPB, 2023 WL 5334582
(N.D. Ga. Aug. 18, 2023) ................................................ 6, 13, 15, 16

*Gonzalez v. Gov'r of Ga.*,
  978 F.3d 1266 (11th Cir. 2020) ....................................................6, 13

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971)......................................................................9, 10

*Jones v. Gov'r of Fla.*,
  950 F.3d 795 (11th Cir. 2020) ....................................................13, 14

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ............................................................13

*Martin v. Crittenden*,
  347 F. Supp. 3d 1302 (N.D. Ga. 2018)..............................................16

*Mi Familia Vota v. Abbott*,
  497 F. Supp. 3d 195 (W.D. Tex. 2020) ..............................................13

*Nat'l Ass'n of the Deaf v. Florida*,
  980 F.3d 763 (11th Cir. 2020) ....................................................11, 12

*Oregon v. Mitchell*,
  400 U.S. 112 (1970)...........................................................................9

*Palmer v. Braun*,
  287 F.3d 1325 (11th Cir. 2002) ..........................................................6

*Saenz v. Roe*,
  526 U.S. 489 (1999)......................................................................9, 10

*Sandusky Cnty. Democratic Party v. Blackwell*,
  387 F.3d 565 (6th Cir. 2004) ............................................................20

*Santos v. Healthcare Revenue Recovery Grp., LLC.*,
  90 F.4th 1144 (11th Cir. 2024) ...........................................................7

*Shapiro v. Thompson*,
  394 U.S. 618 (1969)...........................................................................9

*In re Shek*,
  947 F.3d 770 (11th Cir. 2020) .............................................................8

*United States v. Comstock,*
  560 U.S. 126 (2010) ................................................................................9, 10

*United States v. Guest,*
  383 U.S. 745 (1966) ......................................................................................10

*Vote.org v. Ga. State Election Bd.,*
  661 F. Supp. 3d 1329 (N.D. Ga. 2023) .......................................................19

**Statutes**

28 U.S.C. § 2403(a) ...........................................................................................15

52 U.S.C. § 10502(a) ...............................................................................2, 10, 11

52 U.S.C. § 10502(b) .........................................................................................10

52 U.S.C. § 10502(c) ...........................................................................................8

52 U.S.C. § 10502(d) .................................................................................2, 7, 8

52 U.S.C. § 10502(e) ...........................................................................................7

O.C.G.A. § 21-2-381(a)(1)(A) ..................................................................2, 7, 18

O.C.G.A. § 21-2-381(b)(1) ..................................................................................7

O.C.G.A. § 21-2-384 ..........................................................................................18

O.C.G.A. § 21-2-385(d) .......................................................................................7

**Other Authorities**

116 Cong. Rec. S6991 (Mar. 11, 1970) ........................................................11, 12

Fed. R. Civ. P. 5.1 ..............................................................................................15

## INTRODUCTION

For more than fifty years, Section 202(d) of the Voting Rights Act has required states to allow any qualified voter who may be absent from their election district on the day of a presidential election to vote absentee so long as they have applied for an absentee ballot at least seven days before the election. In clear contravention of this mandate, Georgia law requires voters to apply for an absentee ballot at least eleven days before election day. When applied to elections for President or Vice President, the state's deadline deprives Georgians—including members of Plaintiff International Alliance of Theatrical Stage Employees Local 927 ("IATSE")—of rights guaranteed by the Voting Rights Act.

IATSE's members are professionals who work behind the scenes at live theater and television productions. Their jobs require long work hours and extensive travel that make it difficult to accomplish non-work tasks during the work week when travel and production setup generally take place. By moving up the deadline for submitting an absentee ballot application, Georgia robs these members of critical weekend days to submit their ballot application and—in some circumstances— makes it exceedingly difficult for them to do so.

With discovery stayed and the elections drawing closer, immediate action is now necessary to ensure that Plaintiffs can obtain relief applicable to the 2024 cycle. This Court should preliminarily enjoin Defendants from enforcing the state's eleven-

day application deadline because it violates the plain text of Section 202(d) and, in the absence of such relief, will irreparably harm IATSE's members during the upcoming presidential election.

## BACKGROUND

In 1970, Congress amended the Voting Rights Act of 1965 to address "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections." 52 U.S.C. § 10502(a). Included among the amendments was a provision requiring every state to guarantee that "all duly qualified residents . . . who may be absent from their election district or unit" on the day of a presidential election must be allowed to vote absentee so long as they "have applied therefor not later than seven days immediately prior to such election." *Id.* § 10502(d). Georgia election officials complied with this requirement in previous presidential elections, *see* O.C.G.A. § 21-2-381(a)(1)(A) (2019), but in 2021, Georgia law changed such that absentee-by-mail ballot applications now must be submitted at least eleven days before election day, O.C.G.A. § 21-2-381(a)(1)(A). Voters who now fail to comply with Georgia's eleven-day deadline will have their application rejected.

IATSE is an association of stage technicians and stagehands, including set carpenters, riggers, lighting electricians, audio engineers, pyro technicians, and other professionals whose work is necessary to facilitate live performances and events throughout the southeastern United States and beyond. *See* Ex. 1, Herman

Declaration. IATSE members frequently are called away from home on short notice to work across the southeast region, and as a result members often need to vote absentee to participate in presidential elections. For example, Kelsey Bailey, an IATSE member who manages props on live and filmed productions, relied on an absentee ballot to cast her vote in the 2016 presidential election because she was traveling with the show Disney's Frozen on Ice. She is regularly required to travel with one to two weeks' notice, such as when the entirety of the production of Wild 'N Out was moved from Georgia to New Jersey in the fall of 2021, requiring her to relocate for several weeks with only two weeks' notice. *See* Ex. 2, Bailey Declaration.

Justin Michel, an IATSE member who programs lighting for live and filmed productions, relied on absentee voting because he was traveling for work in 2017 and again requested an absentee ballot due to work travel in 2021, although that year he ultimately cast an advance in-person vote. Mr. Michel's current contract on a film extends through November of this year, and because it will involve travel to locations throughout Georgia he will likely rely on absentee voting. *See* Ex. 3, Michel Declaration.

Similarly, Justin Gamerl has traveled throughout the United States and Europe for television productions, including on holiday shows such as A Christmas Story. He works as a rigger, a position that requires extensive time and care to ensure that

3

heavy lighting and other equipment is properly installed over the heads of performers and the audience. Mr. Gamerl was away from home on election day in 2016 as a result of work obligations, and he has had to rely on absentee voting in the past. Mr. Gamerl has since turned to freelance work, where he regularly receives assignments on short notice, particular in the latter months of the year. *See* Ex. 4, Gamerl Declaration.

Because these employees (and other IATSE members like them) often work long hours and travel to new locations shortly before or during elections, carving out time to complete the absentee ballot application and voting process, particularly during the weekday, is challenging enough. The four days lost as a result of Georgia's unlawful deadline makes it even more difficult to vote absentee because it necessarily eliminates a weekend that IATSE members could have used to complete the application process.

IATSE brought this action on October 26, 2023, on behalf of its members to ensure that Defendants do not deprive them of their right under federal law to apply for an absentee ballot up until seven days before election day. ECF No. 1. After members of the State Elections Board ("SEB Defendants") moved to dismiss, IATSE amended its complaint on January 29, 2024, and SEB Defendants renewed their motion to dismiss on February 12, 2024. ECF Nos. 62, 68. On February 28, the assigned judge declined assignment of the case, and it was reassigned. ECF No. 71.

IATSE filed its opposition to the motion to dismiss on February 26; SEB Defendants replied on March 11. ECF Nos. 69, 76. On March 14, the case was reassigned to this Court. ECF No. 80. IATSE now asks this Court for a preliminary injunction to guarantee relief in time for the 2024 presidential election.

## ARGUMENT

Georgia's eleven-day deadline for absentee ballot applications plainly violates the Voting Rights Act, and, unless it is enjoined, IATSE members whose work obligations require travel outside of their election districts in late October and early November will be deprived of critical days in which to submit their absentee ballot applications for the upcoming presidential election.

Each of the prerequisites for a preliminary injunction is met here: IATSE is likely to succeed on the merits because federal law requires absentee ballot applications for presidential elections to be accepted up until seven days before the election, but Georgia law requires applications to be submitted four days earlier; IATSE's members face a substantial threat of irreparable injury absent an injunction because they work extremely long hours under challenging conditions, and with less time to apply for absentee ballots it will be more difficult for them to vote; the harm suffered by IATSE's members greatly outweighs any minimal harm caused by requiring Defendants to comply with federal law by accepting absentee ballot

applications for a few more days; and enforcing compliance with federal law protecting the right to vote is fully consistent with the public interest.

Because each of the preliminary injunction factors weighs in IATSE's favor, and because the harm suffered by IATSE members as a result of enforcement of the eleven-day deadline would be traceable to and redressable by the Defendants, the motion for preliminary injunction should be granted.

## I.   IATSE is likely to succeed on the merits.

A preliminary injunction is appropriate where a party establishes a likelihood of success on the merits; a substantial threat that irreparable injury will occur without the injunction; that the scope of the injury outweighs any harm to opposing parties; and that the requested preliminary injunction "will not disserve the public interest." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). Of these, "[l]ikelihood of success on the merits" is "generally the most important factor." *Gonzalez v. Gov'r of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (quotation marks omitted); *see also In re Georgia Senate Bill 202*, No. 1:21-mi-55555-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023). Here, IATSE is likely to succeed on the merits because enforcement of Georgia's eleven-day absentee ballot deadline with respect to elections for President and Vice President violates federal law.

**A.      Georgia's eleven-day deadline violates the Voting Rights Act.**

The Voting Rights Act enables "all duly qualified residents . . . who may be absent from their election district or unit" on election day to cast an absentee ballot for President and Vice President if they have applied "not later than seven days immediately prior" to the election. 52 U.S.C. § 10502(d). Georgia law, however, requires that "[t]o be timely received, an application for an absentee-by-mail ballot shall be received . . . no later than 11 days prior to the primary, election, or runoff." O.C.G.A. § 21-2-381(a)(1)(A). An application submitted later than that by an otherwise qualified voter will not be accepted, and the voter consequently will not be able to vote absentee. *See id.* § 21-2-381(b)(1). By enforcing this law, Defendants deprive absentee ballot applicants (including IATSE members) of their right under federal law to apply for an absentee ballot until seven days before the presidential election.

Although Georgia law allows in-person advance voting until the Friday prior to an election, *id.* § 21-2-385(d), this option is neither absentee voting within the meaning of Section 202(d) nor does it satisfy the requirement that "*all* duly qualified residents" who may be absent on election day must be allowed to vote absentee if they submit a request within seven days of the election, 52 U.S.C. § 10502(d) (emphasis added). Section 202(d) does not define "absentee," but when considered in the "entire statutory context of the Act," *Santos v. Healthcare Revenue Recovery*

7

*Grp., LLC.*, 90 F.4th 1144, 1152 (11th Cir. 2024), it is clear that Congress intended to distinguish "absentee" voting from "in person" voting. The next subsection, 52 U.S.C. § 10502(e), specifies circumstances under which a voter "shall be allowed to vote . . . in person" as opposed to "by absentee ballot." If Congress had intended "absentee" to include "in person," this distinction would have been meaningless. *See In re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) ("Th[e] surplusage canon obliges us, whenever possible, to disfavor an interpretation when that interpretation would render a 'clause, sentence, or word . . . superfluous, void, or insignificant.'" (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001))). And the preceding subsection, 52 U.S.C. § 10502(c), clarifies that Congress intended for absentee voting to preserve the ability to vote for those who are not "physically present" within the state. By doing so, Congress ensured that "*all* duly qualified residents" would be able to vote absentee if they timely applied and timely returned their ballot, rather than only those qualified residents who could be physically present in the state in the days immediately preceding the election. *Id*. § 10502(d) (emphasis added).

## B.     The Voting Rights Act is constitutionally sound.

Proposed Intervenors challenge the constitutionality of the Voting Rights Act, but Congress's authority to ensure that voters who may be traveling away from their election district are able to vote absentee for President and Vice President and to establish relevant timeframes is well grounded in Supreme Court precedent and the

U.S. Constitution. The Supreme Court held in *Oregon v. Mitchell* that Congress has the power to "set residency requirements and provide for absentee balloting in elections for presidential and vice-presidential electors," with eight justices concurring in this judgment. 400 U.S. 112, 118 (1970). If Congress has the power to provide for absentee balloting in presidential elections—which the *Mitchell* Court unambiguously held that it does—then it has the power under the Necessary and Proper Clause to effectuate absentee balloting by establishing a period during which absentee ballot applications must be accepted. More than two hundred years ago, Chief Justice John Marshall wrote "language that has come to define the scope of the Necessary and Proper Clause . . . : 'Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited . . . are constitutional.'" *United States v. Comstock*, 560 U.S. 126, 134 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819)). In *Mitchell*, eight justices agreed that Congress can provide for absentee balloting in presidential elections; that holding fatally undermines any constitutional challenge to Section 202(d).

Even setting aside *Mitchell*—which this Court cannot do—the statute easily passes constitutional muster. The Constitution indisputably protects "the right to go from one place to another, including the right to cross state borders while en route." *Saenz v. Roe*, 526 U.S. 489, 500 (1999). The Supreme Court repeatedly has declined

"to ascribe the source of this right to travel interstate to a particular constitutional provision," *Shapiro v. Thompson*, 394 U.S. 618, 630 (1969), and has acknowledged that "it does not necessarily rest on the Fourteenth Amendment[.]" *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971). But even though "there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel . . . [a]ll have agreed that the right exists." *United States v. Guest*, 383 U.S. 745, 759 (1966); *see also Saenz*, 526 U.S. at 501 ("[W]e need not identify the source of that particular right in the text of the Constitution. . . . [it] may simply have been 'conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.'"); *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972) ("'[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution.'" (quoting *Guest*, 383 U.S. at 758)).

Because the right to travel, "like other rights of national citizenship, is within the power of Congress to protect by appropriate legislation," *Griffin*, 403 U.S. at 106, the question is "whether the statute constitutes a means that is rationally related" to protecting the right to travel, *Comstock*, 560 U.S. at 134. *See also Dunn*, 405 U.S. at 341 ("The right to travel is an 'unconditional personal right,' a right whose exercise may not be conditioned." (quoting *Shapiro*, 394 U.S. at 643)). It does. Congress expressly enacted Section 202 "in order to secure and protect" several identified rights, including "the inherent constitutional right of citizens to

enjoy their free movement across State lines." 52 U.S.C. § 10502(a), (b). To accomplish this goal, Congress found it "necessary . . . to establish nationwide, uniform standards relative to absentee registration and absentee balloting in presidential elections." *Id.* § 10502(b). These findings reflect the reasonable conclusion that requiring a citizen to be in a particular state at a particular time in order to vote for President burdens that citizen's fundamental right to travel. That is sufficient to permit legislation pursuant to the Necessary and Proper Clause.

Section 202(d) moreover satisfies the more limited congruence and proportionality test for rights protected by the Fourteenth Amendment. The first step in this three-part analysis is to determine "which right or rights" Congress sought to protect. *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 771 (11th Cir. 2020). Congress helpfully identified those rights in the statute itself, including "the inherent constitutional right of citizens to vote for their President and Vice President" and "the inherent constitutional right of citizens to enjoy their free movement across State lines." 52 U.S.C. § 10502(a). The second step is to look at the relevant history to determine whether "Congress had documented a sufficient historical predicate . . . to justify enactment of a prophylactic remedy." *Nat'l Ass'n of the Deaf*, 980 F.3d at 773. It did. For example, two days before the bill that became Section 202 passed the Senate, Senator Goldwater of Arizona noted on the Senate floor that "[a]pproximately 3 to 5 million . . . fully qualified American citizens were denied

the right to vote for President because they were away from home on election day and were not allowed to obtain absentee ballots." 116 Cong. Rec. S6991 (Mar. 11, 1970). He then decried that, although "most States do permit some form of absentee voting, . . . the catch is that some of these same States impose unrealistic cutoff dates on the time when persons can apply for absentee ballots," resulting in "disqualification of great numbers of citizens who do not know early enough that they will be away at the time of voting." *Id.*

The third step is to analyze whether the legislation is "an appropriate response to this history." *Nat'l Ass'n of the Deaf*, 980 F.3d at 773. Ensuring that voters have sufficient time to apply for their absentee ballots for presidential elections clearly is an appropriate response to the problem of millions of Americans being unable to vote for President because of "unrealistic cutoff dates" for absentee ballot applications: it directly targets the identified problem and solves it through a minor adjustment to state laws, most of which (as Senator Goldwater noted) allow for absentee ballot applications on varying timeframes. In enacting Section 202, "the evidence Congress had before it of a constitutional wrong" was significant, and "the scope of the response Congress chose to address that injury" was extremely narrow. *Allen v. Cooper*, 589 U.S. 248, 261 (2020). The statute, therefore, is a permissible exercise of Congress's power under the Fourteenth Amendment.

## II. An injunction is necessary to avoid irreparable harm threatened to IATSE's members.

In the absence of an injunction, IATSE members who must travel close to the election will be deprived of the time provided under federal law in which to submit an absentee ballot application, and some may be unable to comply with Georgia's earlier deadline as a result. For purposes of preliminary injunctive relief, "an injury is irreparable if it cannot be undone through monetary remedies." *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) (quotation omitted). Clearly, "missing the opportunity to vote in an election is an irreparable harm." *Gonzalez*, 978 F.3d at 1272 (quoting *Jones*, 950 F.3d at 828). Indeed, even "*potential* infringement on the right to vote is sufficient to establish irreparable injury." *In re Ga. Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *11 (N.D. Ga. Aug. 18, 2023) (finding risk that "Plaintiffs' member's absentee ballots might be rejected" in the future sufficient to establish irreparable harm (emphasis added)); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (holding restriction on voting rights constitutes irreparable harm because "whether the number is thirty or thirty-thousand, surely some North Carolina minority voters will be disproportionately adversely affected in the upcoming election. And once the election occurs, there can be no do-over and no redress."); *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 219 (W.D. Tex. 2020) ("The existence of alternative means of exercising one's fundamental rights does not eliminate or render harmless

13

the potential continuing constitutional violation of a fundamental right." (quotation omitted)); *Georgia Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016) (recognizing that failure to extend registration deadline could irreparably harm voters). But there also is "[n]o compensation a court can offer" that can undo the difficulties IATSE members will face as a result of Georgia's deadline. *Jones*, 950 F.3d at 828. Because of the nature of their work, IATSE members routinely are called away from their homes on short notice, including during and around election day. Ms. Bailey, Mr. Michel, and Mr. Gamerl are among the many members of Local 927 who travel throughout the country—and sometimes the world—to perform their work, along with many others who regularly travel within Georgia and may be absent from their voting jurisdiction for the entirety of election day voting.

Members who will be away from their election districts on election day will be irreparably harmed by losing several days to apply for an absentee ballot. The loss of the weekend is particularly problematic because, for some members, that is the only time reasonably available to complete personal tasks given their demanding schedules. And IATSE's records show that members have had job assignments requiring travel *during the window between Georgia's deadline and the federal deadline*—meaning that due to the Georgia deadline, they could lose the opportunity to apply for an absentee ballot altogether. *See* Ex. 1.

Absent a preliminary injunction, Defendants likely will argue that the case cannot be resolved in time for the 2024 presidential election. County Defendants have asserted that "it would be ideal to receive a ruling by 8/1/24 to train staff and prepare for any change in procedure," Ex. 5, 1/16/24 Email from Mathew Plott, and SEB Defendants assert that changes to absentee ballot forms following the adoption of SB 202 "took months," Ex. 6, 1/16/24 Email from Brian Field. Due to SEB Defendants' pending motion to dismiss IATSE's Amended Complaint, discovery currently is stayed, and the case cannot proceed until the motion is resolved. Given these representations, immediate action is now necessary so that Defendants will have sufficient time to effectuate this Court's decision. Plaintiff does not endorse these timelines and certainly does not agree that a change to deadline for receipt of absentee ballot applications will cause the dramatic upheaval that SEB Defendants suggest, but Plaintiff nonetheless moves for preliminary relief to ensure that the 2024 presidential election in Georgia is conducted in accordance with federal law. *See In re Georgia Senate Bill 202*, 2023 WL 5334582, at *12 (rejecting argument that preliminary injunction motions were untimely when filed in May of an election year).[1]

---

[1] The Republican National Committee and the Georgia Republican Party, Inc., have moved to intervene in this case, seeking to inject purported constitutional claims regarding the Civil Rights Act. *See* ECF Nos. 51, 52. Plaintiff opposes this intervention but notes that if it is granted the United States will have a statutory right

### III.    The balance of equities and the public interest favor preserving the right to vote.

"In the context of an election, the balance of the equities and the public interest factors are considered in tandem because 'the real question posed . . . is how injunctive relief . . . would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast.'" *In re Ga. Senate Bill 202*, 2023 WL 5334582, at *12 (quoting *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018)) (alterations in original). Here, injunctive relief would benefit the public interest in an orderly presidential election with the fullest possible participation. Plaintiff seeks a modest injunction that would enable qualified voters to submit absentee ballot applications up to the deadline guaranteed under the Voting Rights Act.

In the absence of an injunction, IATSE members and other Georgia voters who must travel near election day will have less time in which to submit their absentee ballot applications, and some may have their absentee ballot applications rejected as untimely and thus be unable to vote. Although SEB Defendants claim that "relief . . . may implicate a vast set of process, internal and external training materials, and/or forms and other publications," Ex. 6, given the nature of the requested relief and the amount of time in which Defendants would have to comply

---

to intervention, which could result in further delay in adjudicating this case. *See* 28 U.S.C. § 2403(a); *see also* Fed. R. Civ. P. 5.1.

with any preliminary relief granted by this Court, it is unlikely that Defendants will face any great difficulty in implementation. And "the public interest is best served by allowing qualified absentee voters to vote and have their votes counted." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1310–11 (N.D. Ga. 2018).

## IV. IATSE has associational standing to challenge Defendants' enforcement of Georgia's absentee ballot deadline.

Organizations like IATSE have standing to sue in federal court on behalf of their members "when [their] members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Each of these requirements is satisfied here.

### A. IATSE members have standing in their own right.

IATSE's members satisfy the three elements of Article III standing: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022). First, as discussed above, IATSE's traveling members are injured by Defendants' enforcement of Georgia's eleven-day absentee ballot deadline

because it shortens the period during which they can apply for an absentee ballot. For this element, the injury in fact need not be significant; "a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)). Here, Georgia's deadline gives IATSE members less time to request absentee ballots and deprives them of privileges guaranteed by federal law. O.C.G.A. § 21-2-381(a)(1)(A). This "concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient" for standing, even if IATSE members still would be able to vote. *Common Cause/Ga.*, 554 F.3d 1340 at 1351 (acknowledging that voters required to present photo identification suffer a sufficient injury for standing, even if they "possess[] an acceptable form of photo identification").

Second, IATSE members' injuries are traceable to and redressable by Defendants. In the context of elections, "[a]n injury is traceable to an election official responsible for the election administration process or rule that allegedly has caused the plaintiff's injury." *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1185 (N.D. Ga. 2022). Under Georgia law, immediate responsibility for processing absentee ballot applications rests with county election officials, O.C.G.A. § 21-2-384, and County Defendants therefore directly enforce the absentee ballot application deadline against IATSE members in Fulton County.

State law also gives SEB Defendants a significant role in enforcing election laws, including specifically the authority "to promulgate reasonable rules and regulations for the implementation of" Georgia's absentee ballot application process. *Id.* § 21-2-381(e). SEB Defendants further have a statutory duty "[t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings" of county election officials, *id.* § 21-2-31, the power to levy functionally unappealable civil penalties on county officials who violate state election law, *id.* § 21-22-33.1(a), (c), (d), and the ability to "suspend county or municipal superintendents and appoint an individual to serve as the temporary superintendent . . . [with] all the powers and duties of a superintendent," *id.* § 21-22-33.1(f). Because SEB Defendants exercise significant control over election processes—including the power to remove county officials or force them to pay substantial fines—the traceability element is satisfied. Indeed, this Court recently found that injuries imposed by a state-law requirement for absentee ballot applications were traceable to and redressable by the State Election Board and its members. *Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1337–38 (N.D. Ga. 2023); *see also Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1338 n.2 (N.D. Ga. 2018) (holding redressability satisfied where SEB Defendant "has the power to notify counties of errors in their computation and tabulation of votes, and to direct them to re-certify such returns").

**B.      IATSE satisfies the remaining elements of associational standing.**

Having established an injury to its members, IATSE easily satisfies the remaining elements of associational standing. Its core mission is to advance the interests of its members, including by supporting their participation in democracy and advocating for the election of politicians who support trade unions. *See* Ex. 1. Ensuring that IATSE's members have sufficient time to apply for absentee ballots so that they can vote—particularly while they are away from their election districts due to the demands of their profession—is germane to the association's mission. *See Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004) (holding labor unions had associational standing to challenge Ohio's provisional balloting rules). And because IATSE seeks only injunctive and declaratory relief, the participation of individual members is not necessary. *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*, 833 F. App'x 235, 239 (11th Cir. 2020) ("When an organization seeks injunctive relief, individual participation of the organization's members is not normally necessary." (quotation marks omitted)); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (same). IATSE thus has associational standing to enforce its members' rights under the Voting Rights Act.

## CONCLUSION

For the foregoing reasons, this Court should issue a preliminary injunction requiring Defendants to comply with the statutory deadline established under the Voting Rights Act for absentee ballot applications in presidential elections.

Dated: April 30, 2024                        Respectfully submitted,

Adam M. Sparks                               */s/ Uzoma N. Nkwonta*
Georgia Bar No. 341578                       Uzoma N. Nkwonta*
Anré D. Washington                           Justin Baxenberg*
Georgia Bar No. 351623                       William K. Hancock*
KREVOLIN & HORST, LLC                        Marcos Mocine-McQueen*
1201 W. Peachtree St., NW                    ELIAS LAW GROUP LLP
3250 One Atlantic Center                     250 Massachusetts Ave NW, Ste 400
Atlanta, GA 30309                            Washington, D.C. 20001
Tel: (404) 888-9700                          Telephone: (202) 968-4490
Fax: (404) 888-9577                          Facsimile: (202) 968-4498
Email: sparks@khlawfirm.com                  unkwonta@elias.law
Email: washington@khlawfirm.com              jbaxenberg@elias.law
                                             whancock@elias.law
                                             mmcqueen@elias.law

                                             *Counsel for Plaintiff International
                                             Alliance of Theater Stage Employees
                                             Local 927*

                                             *Admitted Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with Local Rule 5.1(C) because it is prepared in Times New Roman font at size 14.

Dated: April 30, 2024                        */s/ Uzoma N. Nkwonta*
                                             *Counsel for Plaintiff*