IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

INTERNATIONAL ALLIANCE OF
THEATER STAGE EMPLOYEES
LOCAL 927,

                  *Plaintiff*,

v.

AARON JOHNSON, in his official
capacity as member of the Fulton
County Registration and Elections
Board, *et al.*

                  *Defendants*.

Case No. 1:23-cv-04929-JPB

# BRIEF OF THE UNITED STATES ON THE CONSTITUTIONALITY AND INTERPRETATION OF SECTION 202 OF THE VOTING RIGHTS ACT

**Table of Contents**

PRELIMINARY STATEMENT ......................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...........................................1

STATUTORY BACKGROUND.....................................................................3

ARGUMENT ..........................................................................................6

A.   The Supreme Court has held that Section 202 is constitutional. ........................6

B.   Congress has constitutional authority to regulate federal elections.................12

1.   Congress has the power under Article II to set limits on the deadlines states can set for absentee ballot requests. ..........................................................13

2.   Congress has the power to enact legislation to preserve the national government...............................................................................................17

C.   Section 202 protects the constitutional right to travel. ...................................20

D.   Section 202 validly protects the right to vote under the Fourteenth Amendment. ............................................................................................24

1.   Congress may impose an outer limit on states' absentee ballot request deadlines to protect voters' First and Fourteenth Amendment right to vote. ..........25

2.   Section 202 protects the right to vote as a privilege or immunity of national citizenship under the Fourteenth Amendment. .......................................29

CONCLUSION ......................................................................................31

# Table of Authorities

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................. 28, 31

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ...................... 18

*Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833 (6th Cir. 1997) ........................................................................................................... 17

*Association of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791 (7th Cir. 1995) ......................................................................................... 17

*Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898 (1986) ............................. 20, 22

*Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) ......................................... 21

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................................. 17, 19

*Burdick v. Takushi*, 504 U.S. 428 (1992) ........................................................... 28

*Burroughs v. United States*, 290 U.S. 534 (1934) ........................................... 17, 19

*Bush v. Gore*, 531 U.S. 98 (2000) ................................................................... 24, 26

*Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000) ....................................... 30

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................. passim

*Del Valle v. Secretary of State*, 16 F.4th 832, (11th Cir. 2021) ............................ 12

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019). 25, 26, 29

*Ex parte Siebold*, 100 U.S. 371 (1879) .............................................................. 13

*Ex parte Yarbrough*, 110 U.S. 651 (1883) ...................................................... 18, 30

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .................................................. 17

*Foster v. Love*, 522 U.S. 67 (1997) ........................................................ 13, 14, 16

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ....................................................... 2

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ..................................................... 22

*Hall v. Louisiana*, 12 F. Supp. 3d 878 (M.D. La. 2014) ...................................... 30

*Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317 (N.D. Fla.) .............................................................................................................. 14

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023) ............... 2

*Henderson v. McMurray*, 987 F.3d 997, (11th Cir. 2021) ..................................... 12

*Hundertmark v. State of Fla. Dep't of Transp.*, 205 F.3d 1272 (11th Cir. 2000) ... 24

*In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d 1305 (11th Cir. 1999) ..................................................................................................... 24

*In re Quarles*, 158 U.S. 532 (1895) .................................................................. 30

*Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023) ............................................ 11

*McConnell v. Fed. Election Comm'n*, 540 U.S. 93, (2003) ................................... 19

*Mcpherson v. Blacker*, 146 U.S. 1 (1892) ......................................................... 26

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001) .......................................... 14

*Morris v. Douglas Cnty. Bd. of Educ.*, No. 1:07-CV-00162, 2007 WL 9710488 (N.D. Ga. Oct. 12, 2007) ................................................................................. 30

*New Ga. Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020) ......................28
*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ............................... 26, 27
*Oregon v. Mitchell*, 400 U.S. 112 (1970) ........................................... passim
*Saenz v. Roe*, 526 U.S. 489 (1999) ................................................ 22, 31
*Shapiro v. Thompson*, 394 U.S. 618 (1969)............................................20
*Trump v. Anderson*, 601 U.S. 100 (2024) .......................................... 27, 28
*Twining v. New Jersey*, 211 U.S. 78 (1908) .........................................30
*U.S. ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330 (E.D. La. 1965) ...............................................................30
*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779  (1995) ....................................18
*United States v. Classic*, 313 U.S. 299 (1941)................................... 15, 30
*United States v. Comstock*, 560 U.S. 126 (2010)....................................15
*United States v. Guest*, 383 U.S. 745 (1966) .......................................22
*United States v. Louisiana*, 196 F. Supp. 3d 612 (M.D. La. 2016) ......................15
*United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546  (11th Cir. 1984)...........23
*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) ..................................24
*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir. 2000) .................14
*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001)..............14
*Voting Rts. Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995)....................................17
*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) ............................................24

## Statutes

52 U.S.C. 10502........................................................................ passim
O.C.G.A. § 21-2-381(a)(1)(A) ..................................................................1

## Other Authorities

116 Cong. Rec. (1970) ....................................................... passim
*Amendments to the Voting Rights Act of 1965:  Hearings Before the Subcomm. on Const. Rights of the S. Comm. on the Judiciary* 188 (1969) ("VRA Hearings")..3, 4, 5
U.S. Const. Amend. XIV, § 1 ...................................................................29
U.S. Const. art. I, § 4.................................................................................13
U.S. Const. art. II, § 1 ................................................................... 13, 15, 16
VRA Amendments of 1970, Pub. L. No. 91-285, § 202, 84 Stat. 316-317..............5

## PRELIMINARY STATEMENT

The United States has intervened to defend the constitutionality of Section 202 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10502.  Section 202 sets federal standards for absentee voting in presidential elections, including subsection (d)'s requirement that states allow voters to request an absentee ballot "not later than seven days" before presidential Election Day.  52 U.S.C. § 10502(d).  As explained below, the Supreme Court in *Oregon v. Mitchell*, 400 U.S. 112 (1970), definitively upheld the constitutionality of Section 202's absentee ballot requirements, including subsection (d)'s absentee request provision.  This binding precedent precludes constitutional attack on Section 202.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff challenges a Georgia law limiting absentee voting to voters who have applied for an absentee ballot by eleven days before Election Day, including presidential Election Day.  *See* Am. Compl. ¶ 3 (citing O.C.G.A. § 21-2-381(a)(1)(A)).  The Amended Complaint alleges that this provision violates Section 202(d).  *Id.* at ¶¶ 29-31; *see also* 52 U.S.C. § 10502(d).  Section 202(d) mandates that "each State shall provide by law for the casting of absentee ballots" in presidential elections "by all duly qualified residents of such State who may be

---

[1] At this time, the United States takes no position on any factual dispute before the Court, nor on any legal question other than those described herein.

absent from their election district or unit in such State" on Election Day, "and who have applied therefor not later than *seven days* immediately prior to such election." 52 U.S.C. § 10502(d) (emphasis added).

Plaintiff sued under 42 U.S.C. § 1983.  *See* Am. Compl. at ¶ 7.  Members of the Georgia State Election Board ("State Defendants") moved to dismiss Plaintiff's Amended Complaint, arguing that a private plaintiff cannot bring a Section 202 claim under Section 1983 and that the Plaintiff lacks standing.  Defs.' Mot. to Dismiss Plf.'s Am. Compl. at 3–21, ECF No. 68-1.  The United States filed a Statement of Interest, setting forth that 42 U.S.C. § 1983 provides a private right of action to enforce Section 202.[2]  U.S. Stmt., ECF No. 70.  This Court granted the Motion to Dismiss on standing grounds.  Order, ECF No. 97.  The case proceeds against the Fulton County Registration and Elections Board Defendants.

---

[2] A federal statute is "presumptively enforceable" under Section 1983 if it "unambiguously confer[s]" individual federal rights. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–284 (2002).  To rebut the presumption, defendants must "demonstrate that Congress shut the door to private enforcement either [1] expressly, through specific evidence from the statute itself" or "[2] impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under [Section] 1983." *Gonzaga*, 536 U.S. at 284 n.4 (citations and internal quotation marks omitted).  Section 202 unequivocally contains "rights-creating" language. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (quoting *Gonzaga*, 536 U.S. at 284, 287).  And Defendants cannot rebut this presumption because they have not shown that enforcement under Section 1983 would "distort" Congress' enforcement scheme for Section 202. *Id.* at 190 (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127 (2005)).

The Republican National Committee and Georgia Republican Party (together, "Intervenors") have intervened as defendants.  Mot. Intervene, ECF No. 52; Order, ECF No. 84.  Intervenors moved to dismiss on the ground that Section 202 is unconstitutional.  Ints.' Mot. to Dismiss, ECF No. 66.  The United States intervened to defend the statute's constitutionality.  Notice of Intervention, ECF No. 101.  The United States now submits this brief, demonstrating that Section 202 of the Voting Rights Act is constitutional.

Plaintiff's fully briefed motion for preliminary injunction is pending before this Court.  Mot. for Prelim. Inj., ECF No. 83; Ints.' Resp. in Opp., ECF No. 96; Plf.'s Reply, ECF No. 99.

## STATUTORY BACKGROUND

As Congress considered reauthorizing and expanding the VRA in 1970, Senator Barry Goldwater offered an amendment, for himself and 28 other senators, "as a substitute" for a narrower House-passed provision regulating presidential elections.  *See Amendments to the Voting Rights Act of 1965:  Hearings Before the Subcomm. on Const. Rights of the S. Comm. on the Judiciary* 277 (1969) ("VRA Hearings") (statement of Sen. Goldwater).  The amendment changed absentee ballot rules to expand opportunities to vote for President.  *Id.* at 282-83; *see* 116 Cong. Rec. 5689-90 (text of amendment).

In committee hearings and on the floor, Senator Goldwater explained the justifications for his proposed absentee ballot requirements.  In 1968, "[a]pproximately 3 to 5 million . . . fully qualified American citizens were denied the right to vote for President because they were away from home on election day and were not allowed to obtain absentee ballots."  116 Cong. Rec. 6991 (1970) (statement of Sen. Goldwater); *see* VRA Hearings 281.  Most states allowed absentee voting by at least some voters, but "some of these same States impose[d] cutoff dates on the time when persons can apply for absentee ballots," which "result[ed] in the disqualification of great numbers of citizens who do not know early enough that they will be away at the time of voting."  116 Cong. Rec. 6991 (statement of Sen. Goldwater); *see* VRA Hearings 281.

Senator Goldwater laid out four constitutional grounds for proposed amendment: Congress's power (1) to enforce the Fourteenth Amendment's right to vote; (2) under the Necessary and Proper Clause to protect the right to vote for federal officers, a right "inherent in national citizenship"; (3) "to protect the freedom of movement by citizens across State lines"; and (4) under the Necessary and Proper Clause to enforce Article IV's Privileges and Immunities Clause, to prevent "unequal treatment among citizens" and "to enable the citizens of one State to better have the same opportunity to choose the President that is enjoyed by citizens of most States."  116 Cong. Rec. at 6992-94 (statement of Sen.

Goldwater); VRA Hearings 285, 289-91.  Senator Goldwater also explained that states had no basis for requiring an earlier ballot request deadline: "37 States" already "permit[ted] some voters to apply for absentee ballots 7 days before an election," which "indicate[d] that more restrictive rules are not necessary."  116 Cong. Rec. at 6993 (statement of Sen. Goldwater); VRA Hearings 289.

Congress adopted Senator Goldwater's amendment as Section 202 of the VRA.  *See* VRA Amendments of 1970, Pub. L. No. 91-285, § 202, 84 Stat. 316-17. And Congress agreed with Senator Goldwater's constitutional rationales, making express findings about each of the constitutional ills caused by "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections."  52 U.S.C. § 10502(a).  To that end, Congress "establish[ed] nationwide, uniform standards relative to absentee registration and absentee balloting in presidential elections."  52 U.S.C. § 10502(b).

Section 202(d) requires each state to allow absentee ballots for President and Vice President "by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held *and who have applied therefor not later than seven days immediately prior to such election* and have returned such ballots . . . not later than the time of closing of the polls in such State on the day of such election."  52 U.S.C. § 10502(d) (emphasis

added).  It merely sets a floor; states may impose more generous absentee balloting rules.  *See* 52 U.S.C. § 10502(g).

## ARGUMENT

### A. The Supreme Court has held that Section 202 is constitutional.

The Supreme Court has unequivocally held that Section 202 is constitutional.  In *Oregon v. Mitchell*, the Court adjudicated Oregon's and Texas's original actions against the Attorney General challenging portions of the 1970 VRA Amendments, as well as the Attorney General's original actions against Arizona and Idaho for violations of those Amendments.  U.S. Compl. against Idaho, ECF No. 66-1; s*ee Mitchell*, 400 U.S. at 117 n.1 (op. of Black, J.).  The Idaho suit required the Court to adjudicate Section 202's constitutionality. *Mitchell*, 400 U.S. at 117 n.1.  Eight Justices upheld Section 202, "concur[ring] in th[e] judgment" that "Congress can set residency requirements and provide for absentee balloting in elections for presidential and vice-presidential electors." *Id.* at 118-19.

Intervenors ignore the clear language of the Court's opinion in contending that *Oregon v. Mitchell* stopped short of deciding that Section 202's absentee balloting provisions were constitutional.  Ints.' Mot. to Dismiss at 7.  That decision upheld *all* of Section 202, including Section 202(d)'s seven-day absentee ballot request provision; there was no specific carveout made for the seven-day request

provision.  *Mitchell*, 400 U.S. at 119.  Justice Black stated that "Congress can . . .

*provide for absentee balloting* in elections for presidential and vice-presidential

electors," and noted that "my Brothers THE CHIEF JUSTICE, DOUGLAS,

BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN concur in this

judgment."  *Id.* at 118 (emphasis added) (op. of Black, J.).  "Therefore," he

announced, "the . . . *absentee balloting provisions* of the Act are upheld."  *Id.* at

119 (emphasis added).  Thus, the Court's judgment on its face applies to all of

Section 202's absentee ballot requirements—including Congress's outer bound for

absentee ballot request deadlines.

The Justices' opinions confirm that they considered Section 202's absentee

ballot rules when concluding that Section 202 was constitutional.  Justice Black

expressly noted that "Congress provided uniform national rules for absentee voting

in presidential and vice-presidential elections," and upheld those rules.  *Id.* at 134.

Justices Brennan, White, and Marshall observed that "the States are compelled"

under Section 202 "to permit the casting of absentee ballots by all properly

qualified persons who have made application not less than seven days prior to the

election," *id.* at 236 (op. of Brennan, White, & Marshall, JJ.), and they rejected

Idaho's concerns about administrative infeasibility by echoing Senator

Goldwater's finding that "[t]hirty-seven States allow application within a week of

the election," *id.* at 239.  Justice Douglas also noted that Section 202 "provides for absentee voting."  *Id.* at 147-48.[3]

Intervenors also incorrectly insist that the seven-day absentee ballot request provision was not at issue in *Mitchell* because Idaho—the only State whose laws were alleged to violate Section 202—had no precise deadline for requesting absentee ballots.  *See* Ints.' Mot. at 6-7, 12-13.  Despite the lack of an across-the-board absentee ballot application deadline in Idaho, *see Mitchell*, 400 U.S. at 227 (Harlan, J., concurring in part and dissenting in part) (reprinting Idaho Code § 34-1101 (1969)), provisions of Idaho law placed Section 202's ballot request provision at issue.  New residents who wished "to vote for presidential and vice-presidential electors" were required, "on or before *ten (10) days* prior to the date of the general election," to "make an application in the form of an affidavit executed in duplicate in the presence of the county auditor."  *Id.* at 226 (reprinting Idaho Code § 34-409 (1969)) (emphasis added).  And Idaho prohibited new residents

---

[3] Even Justice Stewart, joined by Chief Justice Burger and Justice Blackmun, who did not expressly mention Section 202's absentee ballot provisions, stated that he would uphold "Section 202" as a *whole*, and described the Section as "a comprehensive provision aimed at insuring that a citizen will not be deprived of the opportunity to vote for the offices of President and Vice President because of a change of residence."  *Mitchell*, 400 U.S. at 285 (Stewart, J., concurring in part and dissenting in part); *see* Ints.' Mot. at 5-6 (acknowledging that these Justices "described their decision as broadly upholding 'Section 202 [of] the Voting Rights Act Amendments of 1970,' which contains the uniform absentee voting rules" (alteration in original)).

from voting absentee in presidential elections, instead requiring them to "mark forthwith the ballot in the presence of the county auditor."  *Id.* at 226-27 (reprinting Idaho Code § 34-413 (1969)).  Thus, for new residents at least, Idaho law directly conflicted with Section 202(d), which requires states to allow absentee ballots by *all* qualified, absent voters who apply not later than seven days prior to presidential Election Day.  52 U.S.C. § 10502(d).

Both sides' arguments reflected that Section 202(d)'s absentee ballot request provision was at issue.  Paragraphs 4 and 5 of the United States' complaint discussed Idaho's ten-day presidential ballot request deadline for new residents and its prohibition on absentee ballots for new residents.  *See* U.S. Compl. against Ida., ECF No. 66-1, at 4.  The complaint then included the VRA's seven-day absentee ballot request provision in its discussion of the relevant portions of Section 202. *Id.* at 5.  And it sought declaratory and injunctive relief regarding Idaho's absentee voting provisions.  *Id.* at 7-8.  Idaho's answer, in turn, denied that its "absentee voting provisions" were preempted "to the extent inconsistent with Section 202," and requested "a declaratory judgment that Section[] 202"—in its entirety—is unconstitutional.  Answer at 2, *United States v. Idaho*, 400 U.S. 112 (1970) (No. 47, Original) (Ex. 1).

The parties' briefs likewise directly addressed Section 202(d)'s absentee ballot request provision.  Citing the above-mentioned Idaho Code sections, the

9

United States' brief emphasized that "Idaho law does not permit persons who have lived within the state for less than six months to register by mail *or to vote by absentee ballot*." *U.S. Mitchell* Br. at 15 (Ex. 2) (emphasis added; citations omitted). Idaho's merits brief likewise pointed to the state law provisions setting a ten-day ballot request deadline and forbidding absentee voting for new residents. Br. for Idaho at 9 n.1, *United States v. Idaho*, 400 U.S. 112 (1970) (No. 47, Original) (Idaho *Mitchell* Br.) (Ex. 3). It acknowledged that those provisions "set forth standards for non-resident voting," *id.* at 25, and defended the State's "absentee ballot provisions" as serving the "compelling state interest[s]" of preventing fraud and "aid[ing] ease of administration," *id.* at 26-27; *see Mitchell*, 400 U.S. at 238-39 (op. of Brennan, White, & Marshall, JJ.) (rejecting these rationales by citing data regarding other states' absentee ballot request deadlines). The Question Presented in both sides' Supreme Court briefs was framed broadly enough to include the absentee ballot request provision, asking whether the 1970 VRA amendments were constitutional "insofar as they . . . prescribe uniform standards regarding absentee registration and absentee balloting in presidential elections." U.S. *Mitchell* Br. at 2; Idaho *Mitchell* Br. at 1-2. It therefore cannot seriously be argued that Section 202(d)'s absentee ballot request provision was not at issue in *Mitchell*.

Further, contrary to Intervenors' argument, later cases applying different standards do not undermine the Court's decision in *Mitchell*.  *See* Ints.' Reply to Mot. to Dismiss, ECF No. 93, at 2, 9.  "'If a precedent of th[e Supreme] Court has direct application in a case,' . . . a lower court 'should follow the case which directly controls,' . . . . even if the lower court thinks the precedent is in tension with 'some other line of decisions.'"  *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (citations omitted).  *Mitchell* directly controls.

Moreover, *Mitchell*'s holding also encompasses Section 202(d)'s absentee ballot *receipt* provision.  Section 202(d) requires each State to accept any absentee ballot that is "returned . . . not later than the time of closing of the polls in such State on the day of such election."  52 U.S.C. § 10502(d).  Intervenors acknowledge that the United States' suit challenged Idaho's law that required all absentee ballots to be "received by the issuing officer by 12:00 o'clock noon on the day of the election," rather than by the close of polls.  *Mitchell*, 400 U.S. at 227 (Harlan, J., concurring in part and dissenting in part); Ints.' Mot. at 6-7; *see* U.S. Compl. Against Ida., ECF No. 66-4, at 4 ("Absentee ballots must be received by the issuing officer by noon on the day of an election.").

The constitutionality of the VRA's contrary absentee ballot receipt provision thus plainly was before the Court.  And the Court's rationales for upholding Section 202(d)'s absentee ballot *receipt* deadline equally apply to its absentee

ballot *request* floor.  Both measures regulate the timing of the absentee balloting process in presidential elections and protect the voting rights of those who travel during such elections.  Each ground on which the Justices upheld Section 202 generally covers Section 202(d)'s ballot request provision, just as it does the ballot receipt provision.  The Supreme Court's reasoning is necessary to its decision and thus forms part of its holding, which binds this Court.  *See Del Valle v. Secretary of State*, 16 F.4th 832, 841 (11th Cir. 2021).  But "[e]ven if the relevant language in [*Mitchell*] is dicta," lower courts "are obligated to respect it."  *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021).  Because *Mitchell* is apposite and binding, this Court should uphold Section 202's absentee ballot request provision.

**B. Congress has constitutional authority to regulate federal elections**.

*Mitchell* resolved Section 202(d)'s constitutionality.  Still, the seven-day absentee ballot request provision is easily sustained on numerous grounds, each of which independently supports the constitutionality of the statute.  As explained further below, Congress can limit states' absentee ballot request deadlines under its Article II power to pick the time of choosing presidential electors, its power to effectuate Article II under the Necessary and Proper Clause, and its inherent authority to maintain a national government.

**1. Congress has the power under Article II to set limits on the deadlines states can set for absentee ballot requests.**

Section 202(d)'s ballot request provision is also constitutional under Article II.  The Constitution provides that "[t]he Congress may determine *the Time of ch[oo]sing the Electors*, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."  U.S. Const. art. II, § 1, cl. 4 (emphasis added).  Congress's constitutional authority to "regulate the time of the election" includes power to prescribe timing for "the combined actions of voters and officials meant to make a final selection of an officeholder."  *Foster v. Love*, 522 U.S. 67, 71 (1997); *cf. Ex parte Siebold*, 100 U.S. 371, 396 (1879) (allowing Congress to regulate "the times of voting").

In *Foster*, the Court held that Louisiana's open primary system—which placed all congressional candidates on the ballot in October and dropped the general election if one candidate received a majority—"does purport to affect the timing of federal elections" by allowing the actions of voters and officials needed to elect members of Congress to be completed before Congress's chosen Election Day.  522 U.S. at 73.  While *Foster* directly addressed Congress's power to regulate congressional elections under the Article I Elections Clause, both it and Article II's Electors Clause identically authorize Congress to regulate the "Time" of federal elections, U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 4.  *Foster* also recognized Congress's Article II time-regulation authority as the Elections

13

Clause's "counterpart for the Executive Branch," 522 U.S. at 69. Congress's power to issue time-related rules under each clause, therefore, is coterminous. *Cf. id.* Accordingly, Congress may regulate the timing of the activities that constitute the choice of presidential electors.

Likewise, Article II's grant of power to determine the "Time" of choosing presidential electors "does not require that individual voters all choose the Electors on the same day." *Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324 (N.D. Fla.) (citation omitted), *aff'd*, 235 F.3d 578 (11th Cir. 2000). Courts have thus uniformly rejected challenges to state laws allowing early voting, noting that, while Congress has set a single date for the presidential "election," it also has required absentee voting for federal elections in Section 202 and other statutes. *See Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d 535, 544-545 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776-777 (5th Cir. 2000). Congress thus has power to decide "which" of the actions of voters and officials needed to choose electors "must occur on federal election day" versus some other day. *Millsaps*, 259 F.3d at 544. Congress may set a multi-day voting period or set varied deadlines related to different forms of voting. *Cf. Foster*, 522 U.S. at 72.

Article II, particularly when read with the Necessary and Proper Clause, authorizes Congress to regulate absentee ballot request deadlines in regulating the

timing of the choice of electors.  Congress's authority under the Necessary and Proper Clause "leaves to the Congress the choice of means by which its constitutional powers are to be carried into execution," *United States v. Classic*, 313 U.S. 299, 320 (1941), including its powers to regulate the timing of presidential elections.  "[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  *United States v. Comstock*, 560 U.S. 126, 134 (2010).

Hence, there need only be a rational relationship between setting an outer bound on states' deadlines for applying for absentee ballots and regulating the "Time of ch[oo]sing the Electors."  U.S. Const. art. II, § 1, cl. 4.  Such a connection is easy to find.  Congress rationally could determine that, if presidential electors are to be chosen at Congress's specified time in a world with absentee voting, *id.*, it must regulate when voters must request and return such ballots, just as it must regulate when in-person voters must appear and cast their ballots.  *Cf. United States v. Louisiana*, 196 F. Supp. 3d 612, 625 (M.D. La. 2016) ("[T]he Necessary and Proper Clause has been read to authorize legislation deemed essential to the realization of principal aims animating the Elections Clause."), *vacated on other grounds*, 2017 WL 4118968 (Aug. 21, 2017).

The seven-day absentee ballot request provision falls squarely within Congress's power to specify the times of choosing electors. *Mitchell* approved, and this case does not implicate, Section 202's baseline requirement that states furnish absentee ballots to all those who may be absent from their election districts on the date of a presidential election. *See Mitchell*, 400 U.S. at 118-119 (op. of Black, J.). Rather, as Intervenors themselves note, "[t]his case concerns" only "a narrow portion of" Section 202: "the federal seven-day deadline for absentee ballot applications." Ints.' Mot. at 6, 12. Taking the existence of absentee voting requirements as a given, the seven-day ballot request provision plainly constitutes a regulation of the *time* by which states may require voters to take an action that is necessary "to make a final selection of an officeholder." *Foster*, 522 U.S. at 71. Indeed, Congress explicitly tied the time for requesting a ballot to the date of the "presidential election." 52 U.S.C. § 10502(d). Thus, the ballot request provision itself is a permissible regulation of the "Time of ch[oo]sing the Electors." U.S. Const. art. II, § 1, cl. 4.[4]

---

[4] Intervenors wrongly assert that a majority in *Mitchell* "agreed that Congress could not have enacted Section 202 under" Article II. Ints.' Mot. at 16. Justice Black relied on Article II to uphold Section 202, and only Justice Harlan expressly rejected Justice Black's rationale. *See Mitchell*, 400 U.S. at 213 (Harlan, J., concurring in part and dissenting in part). The other Justices did not opine on the issue.

## 2. Congress has the power to enact legislation to preserve the national government.

Additionally, Congress's authority encompasses any legislation Congress deems necessary and proper to protect and maintain the federal government. *Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976) (per curiam). Congress may act to protect "the purity of presidential and vice presidential elections," as long as it does not unduly "interfere with the power of a state" under Article II's Electors Clause "to appoint electors or the manner in which their appointment shall be made." *Burroughs v. United States*, 290 U.S. 534, 544 (1934). Indeed, Article II's Electors Clause "has been interpreted to grant Congress power over Presidential elections coextensive with that which Article I section 4 grants it over congressional elections." *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995); *accord Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997); *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995); *see Fish v. Kobach*, 840 F.3d 710, 719 n.7 (10th Cir. 2016). Justice Black upheld Section 202 based on this congressional power "to regulate federal elections." *Mitchell*, 400 U.S. at 134.

As the Framers recognized, "'every government ought to contain in itself the means of its own preservation,' and 'an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy.'" *Arizona v. Inter Tribal Council of*

*Ariz., Inc.*, 570 U.S. 1, 8 (2013) (quoting *The Federalist No. 59*, at 362-63 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).  The Elections Clause and Article II "reflect the idea that the Constitution treats both the President and Members of Congress as federal officers."  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 n.17 (1995).  "Essential to the survival and to the growth of our national government is its power to fill its elective offices and to insure that the officials who fill those offices are as responsive as possible to the will of the people whom they represent."  *Mitchell*, 400 U.S. at 134 (op. of Black, J.).

More than 140 years ago, the Court in *Ex parte Yarbrough* held that Congress could protect the right to vote in presidential elections against state and private interference.  110 U.S. 651, 662, 666 (1883).  Both "the interest of the party concerned" and "the necessity of the government itself" require "that the votes by which its members of congress *and its president* are elected shall be the *free* votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice."  *Id.* at 662 (first emphasis added).  The Court pointed directly to the Necessary and Proper Clause to refute the argument that Congress has "no *express* power to provide for preventing violence exercised on the voter as a means of controlling his vote."  *Id.* at 658.

Fifty years later, in *Burroughs*, the Court upheld a federal disclosure law for presidential campaigns.  290 U.S. at 534.  The challengers asserted that Congress

had power only to set the time for choosing electors, but the Court held that "[s]o narrow a view of the powers of Congress in respect of the matter is without warrant." *Id.* at 544. The Court determined that Congress possesses the power to regulate campaign finance for the same reasons "it possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." *Id.* at 545, 547. The Court held that "[t]he power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress." *Id.* at 547-548. *See also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 187 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *Buckley*, 424 U.S. at 13, 90 (per curiam).

These precedents provide ample authority to sustain Section 202(d)'s absentee ballot request provision as a permissible exercise of Congress's power to regulate presidential elections. Setting a date by which voters must be allowed to request absentee ballots fits snugly within Congress's Article II and Necessary and Proper Clause powers, as well as within its inherent authority to protect the smooth functioning of presidential elections and to ensure that the President and Vice President are "as responsive as possible to the will of the people whom they represent." *Mitchell*, 400 U.S. at 134 (op. of Black, J.).

**C. Section 202 protects the constitutional right to travel.**

In passing Section 202, Congress found that the lack of opportunity to cast absentee ballots in presidential elections "denies or abridges the inherent constitutional right of citizens to enjoy their free movement across State lines."  52 U.S.C. § 10502(a)(2).  Six Justices in *Mitchell* agreed that Section 202 was a permissible means of protecting the right to travel.  400 U.S. at 239 (op. of Brennan, White, & Marshall, JJ.); *id.* at 285-286 (Stewart, J., concurring in part and dissenting in part).

"Th[e Supreme] Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement."  *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974).  "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right."  *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (citations and internal quotation marks omitted).  Intervenors are therefore incorrect asserting that a law must be targeted solely at interstate travelers to trigger this constitutional right.  *See* Ints.' Mot. at 10.

Too-early deadlines for requesting absentee ballots, Congress found, "denies or abridges the inherent constitutional right of citizens to enjoy their free movement across State lines."  52 U.S.C. § 10502(a)(2).  Such deadlines require voters to request an absentee ballot significantly ahead of time, even if they do not yet know that they will be traveling that day.  They thus "force a person who wishes to travel . . . to choose between travel and the basic right to vote.  Absent a compelling state interest, a State may not burden the right to travel in this way."[5] *Dunn v. Blumstein*, 405 U.S. 330, 342 (1972) (citation omitted); *see also Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004) (condemning as "an especially malignant unconstitutional condition" a situation in which "citizens are being required to surrender a constitutional right . . . not merely to receive a discretionary benefit but to exercise . . . other fundamental rights").  Such deadlines also "result[] in the unequal distribution of" the right to vote based on whether residents seek to exercise their right to travel during an election.  *Soto-Lopez*, 476 U.S. at

---

[5] As explained further below, p. 27, *infra*, no compelling state interest justifies having deadlines earlier than seven days before presidential elections.  52 U.S.C. 10502(a)(6) (congressional finding that earlier absentee ballot request deadlines "do[] not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections."); *see also* 116 Cong. Rec. at 6991 (statement of Sen. Goldwater); *Mitchell*, 400 U.S. at 239 (opinion of Brennan, White, & Marshall, JJ.) (citation omitted) (explaining the assertion that earlier deadlines were necessary for administrability reasons is "difficult to credit" when "[t]he provisions for absentee voting" in Section 202 were "drawn from the proven practice of the States themselves").

903.  Congress has authority to limit states' ability to so impede voters' right to travel.  *Griffin v. Breckenridge*, 403 U.S. 88, 106 (1971).

Intervenors incorrectly insist that Section 202(d) cannot survive review under the "congruence and proportionality" standard that *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), held applies to enforcement legislation under Section 5 of the Fourteenth Amendment.  Ints.' Mot. at 8-15.  *City of Boerne* does not apply here, because "the right to travel freely from State to State finds constitutional protection that is quite independent of the Fourteenth Amendment."  *United States v. Guest*, 383 U.S. 745, 759 n.17 (1966).  The Court repeatedly has refused to "identify the source" of the "right to free interstate movement," as "[t]he right of 'free ingress and regress to and from' neighboring States . . . may simply have been 'conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.'"  *Saenz v. Roe*, 526 U.S. 489, 501 (1999) (citations omitted)).  Thus, the "constitutional right of interstate travel is a right secured against interference from any source whatever, whether governmental or private."  *Guest*, 383 U.S. at 759 n.17; *see Saenz*, 526 U.S. at 498.

Even if *City of Boerne* applied (which it does not), Intervenors' objections about the adequacy of Congress's findings would fall short.  *See* Ints.' Mot. at 11-12.  Congress found that a small minority of states inflicted an outsized burden on the right to travel by imposing unreasonable deadlines for requesting and returning

absentee ballots.  116 Cong. Rec. at 6992-6994 (Statement of Sen. Goldwater).

And Congress reasonably determined that states lack an administrative interest in

imposing earlier request deadlines when nearly three quarters of the states already

imposed deadlines of seven days or less.  *Id.* at 6993.  Regardless, "[j]udicial

deference, in most cases, is based not on the state of the legislative record

Congress compiles but 'on due regard for the decision of the body constitutionally

appointed to decide.'"  *City of Boerne*, 521 U.S. at 531-532 (quoting *Mitchell*, 400

U.S., at 207 (opinion of Harlan, J.)).  And, thus, "[a]s a general matter, it is for

Congress to determine the method by which it will reach a decision."  *Id.*

Intervenors get no further by claiming Section 202(d) is overinclusive.  Ints.'

Mot. at 10.  "Legislation which deters or remedies constitutional violations can fall

within the sweep of Congress' enforcement power even if in the process it

prohibits conduct which is not itself unconstitutional and intrudes into 'legislative

spheres of autonomy previously reserved to the States.'"  *City of Boerne*, 521 U.S.

at 518 (citation omitted).  In short, "Congress may paint with a much broader brush

than may this Court."  *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546,

1560 (11th Cir. 1984) (quoting *Mitchell*, 400 U.S. at 284 (Stewart, J., concurring in

part and dissenting in part)).[6]

---

[6] Intervenors' charge of under inclusiveness—because Section 202 applies only in
presidential elections—also rings hollow.  *See* Ints.' Mot. at 11.  Congruence and

*Shelby County v. Holder*, 570 U.S. 529 (2013), also does not apply.  *See*

Ints.' Mot. at 9, 11; Ints. Reply at 7-8.  Congress need not constantly re-justify

Section 202.  Nothing in the Reconstruction Amendments' text or history, nor in

*City of Boerne*, causes statutes to lapse if not continually tended to by Congress.  In

fact, the Court in *City of Boerne* expressly disclaimed "that § 5 legislation requires

termination dates."  521 U.S. at 553.  To the contrary, courts routinely have upheld

decades-old statutes based on the scope of the problem at the time of enactment,

relying on the enacting Congress's legislative record.[7]

### D. Section 202 validly protects the right to vote under the Fourteenth Amendment.

Finally, Congress had authority under Section 5 of the Fourteenth

Amendment to protect voters' right to vote for president, which Section 1 of that

Amendment guarantees.  *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam).

---

proportionality review does not require the narrow tailoring to which legislative acts must conform under strict scrutiny.  *See City of Boerne*, 521 U.S. at 517-520, 531-532, 536 (noting high level of deference the Court owed to Congress's judgment).  And even under strict scrutiny review, a legislature "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns."  *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015).  After all, it is "somewhat counterintuitive to argue that a law" exceeds Congress's constitutional authority by infringing "*too little*" on state power.  *Id.* at 448.

[7] *See*, *e.g.*, *Vote.Org v. Callanen*, 89 F.4th 459, 486-87 & n.11 (5th Cir. 2023) (1964 statute); *Nat'l Ass'n of the Deaf*, 980 F.3d at 773-74 (11th Cir. 2020) (1990 statute); *In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1323 (11th Cir. 1999) (1972 provision); *Hundertmark v. State of Fla. Dep't of Transp.*, 205 F.3d 1272, 1276 (11th Cir. 2000) (1973 provision).

Voters also "have a First Amendment right 'to associate for the advancement of political beliefs.'" *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (citation omitted).  As a protection of voters' First and Fourteenth Amendment rights to vote, or as a protection of a privilege and immunity of national citizenship, Congress's ballot request provision was a congruent and proportional response to the denial of voting rights it found.

> **1. Congress may impose an outer limit on states' absentee ballot request deadlines to protect voters' First and Fourteenth Amendment right to vote.**

Section 202(d)'s absentee ballot request provision appropriately addresses the burden on voting rights caused by unreasonably early request deadlines.  In enacting Section 202, Congress expressly found that "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections . . . denies or abridges the inherent constitutional right of citizens to vote for their President and Vice President" and "has the effect of denying to citizens the equality of civil rights, and due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment."  52 U.S.C. §§ 10502(a)(1) and (a)(5).  Congress was permitted to remedy these violations by setting an outer limit on absentee ballot request deadlines in presidential elections.

The Supreme Court has recognized an individual right to vote in presidential elections.  It stated that once "the state legislature vests the right to vote for

President in its people," which Georgia has done, Article II nationalizes this choice and provides a "federal constitutional right to vote for electors for the President of the United States." *Bush*, 531 U.S. at 104; *see also McPherson v. Blacker*, 146 U.S. 1, 35-36 (1892) (stating that "public opinion had gradually brought all the states as matter of fact to the pursuit of a uniform system of popular election by general ticket" of presidential electors). This right "is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter" under the Fourteenth Amendment. *Bush*, 531 U.S. at 104. Voters also "have a First Amendment right 'to associate for the advancement of political beliefs.'" *Lee*, 915 F.3d at 1319 (citation omitted).

"Here, the burden falls on vote-by-mail . . . voters' fundamental right to vote," specifically on the rights of those who cannot vote in person because they may not be physically present in their jurisdiction. *Id.* "Plaintiffs d[o] not need to show that they were legally prohibited from voting, but only that 'burdened voters have few alternate means of access to the ballot.'" *Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (citation omitted). Congress had good reason to conclude that early ballot request deadlines imposed severe burdens on the right to vote: voters who are absent from their home jurisdictions on Election Day on short notice are entirely deprived of their right to vote. *See Obama for Am.*, 697 F.3d at 434 ("[A]bsent voters obviously cannot cast ballots in person."). "[A]ny voter

could be suddenly called away and prevented from voting on Election Day" due to "personal contingencies like medical emergencies or sudden business trips." *Id.* at 435.  In 1968, states' ballot request deadlines prevented three to five million Americans from voting.  116 Cong. Rec. at 6991 (statement of Sen. Goldwater).

Congress demonstrated that states' early absentee ballot request deadlines "do[] not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections."  52 U.S.C. 10502(a)(6).  Congress had data before it that only 13 states had absentee ballot request deadlines more than seven days before the election.  *See* 116 Cong. Rec. at 6991 (statement of Sen. Goldwater).  Any assertion that earlier deadlines were (or are now) necessary for administrative feasibility or fraud prevention is "difficult to credit" when "[t]he provisions for absentee voting" were "drawn from the proven practice of the States themselves."  *Mitchell*, 400 U.S. at 239 (opinion of Brennan, White, & Marshall, JJ.) (citation omitted).  And over five decades' experience with the seven-day floor shows that states can administer elections without earlier absentee ballot deadlines.

Congress has particularly strong authority to regulate states' absentee ballot deadlines to protect individuals' voting rights in *presidential* elections.  Indeed, "the Fourteenth Amendment grants new power to Congress to enforce the provisions of the Amendment against the States."  *Trump v. Anderson*, 601 U.S. 100, 112 (2024) (per curiam).  And "[i]n the context of a Presidential election,

state-imposed restrictions implicate a uniquely important national interest." *Id.* at

115-116 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983)).  Because

"'the impact of the votes cast [for President] in each State is affected by the votes

cast'—or, in this case, the votes not allowed to be cast—'for the various candidates

in other States,'" the imposition of overly stringent absentee ballot request

deadlines by states "would 'sever the direct link that the Framers found so critical

between the National Government and the people of the United States' as a

whole." *Trump*, 601 U.S. at 116 (citations omitted).  Likewise, each "State has a

less important interest in regulating Presidential elections than statewide or local

elections, because the outcome of the former will be largely determined by voters

beyond the State's boundaries." *Anderson*, 460 U.S. at 795; *see also* Ints.' Mot. at

3 (recognizing "presidential elections [a]re unique" in that "candidates are on the

ballot in multiple states," "[t]hey campaign on national platforms, address national

issues, and are chosen by the electors across the country, not just in one State").

Congress's absentee ballot request provision is a congruent and proportional

response to the harm inflicted on the Fourteenth Amendment's right to vote by

early absentee ballot request deadlines, satisfying the *City of Boerne* test.  *See City

of Boerne*, 521 U.S. at 508. [8]  As discussed, Congress enacted Section 202 because

---

[8] *Cf., Anderson*, 460 U.S. at 780; *Burdick v. Takushi*, 504 U.S. 428 (1992); *New Ga.
Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020).  The *Anderson-*

"the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections . . . denies or abridges the inherent constitutional right of citizens to vote for their President and Vice President" and "has the effect of denying to citizens the equality of civil rights, and due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment." 52 U.S.C. §§ 10502(a)(1) and (a)(5). Congress reasonably based this finding on the data discussed above. *See* pp. 4, 26-27, *supra*. In limiting the advance notice states may require of absentee voters, Congress was validly enforcing rather than "decree[ing] the substance of the Fourteenth Amendment's restrictions on the States." *City of Boerne*, 521 U.S. at 519.

### 2. Section 202 protects the right to vote as a privilege or immunity of national citizenship under the Fourteenth Amendment.

Finally, Congress had authority to impose an outer limit on absentee ballot request deadlines to enforce the Privileges or Immunities Clause. *See* U.S. Const. Amend. XIV, § 1. The Supreme Court has long recognized that "[t]he right to vote for national officers is a privilege and immunity of national citizenship." *Mitchell*, 400 U.S. at 149 (op. of Douglas, J.). *Ex parte Yarbrough* held that the right to vote

---

*Burdick* test involves "weigh[ing] the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Lee*, 915 F.3d at 1318. "The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Id.* at 1319.

in federal elections "is guarant[ee]d by the constitution, and should be kept free and pure by congressional enactments whenever that is necessary." 110 U.S. at 665. Then, the Court declared that "[a]mong the rights and privileges which have been recognized by this court to be secured to citizens of the United States by the constitution are . . . the right to vote for presidential electors." *In re Quarles*, 158 U.S. 532, 535 (1895). Later cases have likewise recognized the right to vote as a privilege of national citizenship that Congress may protect.[9]

Section 202(d)'s absentee ballot request provision is a congruent and proportional response to enforcing the Privileges and Immunities Clause. Congress found that "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections . . . denies or abridges the privileges and immunities guaranteed to the citizens of each State." 52 U.S.C. § 10502(a)(3). It reasonably based this finding on data showing millions of voters deprived of their right to vote because of unreasonably early absentee ballot request

---

[9] *See, e.g., Classic*, 313 U.S. at 314-315; *Twining v. New Jersey*, 211 U.S. 78, 97 (1908), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964); *Chen v. City of Houston*, 206 F.3d 502, 524 n.16 (5th Cir. 2000); *Hall v. Louisiana*, 12 F. Supp. 3d 878, 888 (M.D. La. 2014); *Morris v. Douglas Cnty. Bd. of Educ.*, No. 1:07-CV-00162, 2007 WL 9710488, at *6 n.12 (N.D. Ga. Oct. 12, 2007); *U.S. ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 355 (E.D. La. 1965) (three-judge court).

deadlines.[10]  *See* pp. 4, 27, *supra*.  And in limiting the advance notice states may require of absentee voters, Congress was properly enforcing "the substance of the Fourteenth Amendment's restrictions on the States."  *City of Boerne*, 521 U.S. at 519.  As Justice Douglas noted, the Court already "had determined that voting for national officers is a privilege and immunity of national citizenship" before Congress passed Section 202, so "[n]o congressional declaration was necessary." *Mitchell*, 400 U.S. at 149 n.13.  Thus, Congress validly enforced the Privileges and Immunities Clause.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court hold that Section 202 is constitutional.

---

[10] Classifications that discriminate on a basis protected by the Clause generally are subject to strict scrutiny.  *See, e.g.*, *Saenz*, 526 U.S. at 504.  The Court in *Anderson* examined the application of a State's general ballot access law to presidential elections under the more flexible standard that became *Anderson-Burdick*, *see* 460 U.S. at 788-789.  But under either standard, Congress's response to the record before it satisfies the *City of Boerne* test for legislation passed pursuant to Section 5 of the Fourteenth Amendment.  *City of Boerne*, 521 U.S. at 508.

July 22, 2024

RYAN K. BUCHANAN
United States Attorney
600 U.S. Courthouse
75 Ted Turner Dr. SW
Atlanta, GA 30303

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

AILEEN BELL HUGHES
Assistant United States Attorney
Georgia Bar No. 375505
Aileen.bell.hughes@usdoj.gov

*/s/ Holly F.B. Berlin*
R. TAMAR HAGLER
TIMOTHY F. MELLETT
JACKI L. ANDERSON
Illinois Bar No. 6312256
HOLLY F.B. BERLIN
Illinois Bar No. 6329447
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(800) 253-3931
holly.berlin@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that on July 22, 2024, I filed the foregoing via the CM/ECF system, which sends notice to counsel of record.

/s/ Holly F.B. Berlin
Holly F.B. Berlin
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this document complies with Local Rule 5.1(C) because it is prepared in Times New Roman font at size 14.

*/s/ Holly F.B. Berlin*
Holly F.B. Berlin
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
